# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00381-SCT

*JULIA GATES HINES MABUS*

*v.*

*RAYMOND EDWIN MABUS, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/8/2000 |
| TRIAL JUDGE: | HON. STUART ROBINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MINOR F. BUCHANAN |
| | WILLIAM B. KIRKSEY |
| ATTORNEYS FOR APPELLEE: | RICHARD C. ROBERTS, III |
| | ROBERT W. KING |
| | T. ROE FRAZER, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 02/13/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, P.J., EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## PROCEDURAL HISTORY

¶1.     Julia Gates Hines Mabus (Julie) and Raymond Edwin Mabus, Jr. (Ray) were married on January 3, 1987. During the course of the marriage two daughters were born in 1990 and 1992. On January 8, 1998, Julie filed for divorce in the Chancery Court of the First Judicial District of Hinds County. Julie alleged habitual cruel and inhuman treatment, and Ray counterclaimed alleging uncondoned adultery. Prior to trial, Julie stipulated that the fault

ground alleged by her against Ray was without merit. Consequently, the chancellor entered an order which dismissed Julie's claim with prejudice.

¶2. The divorce proceeding was bifurcated. By agreed order Ray's allegation of divorce was tried first. Any remaining issues were to be tried at a later time. After the trial, the chancellor granted a divorce to Ray on the grounds of uncondoned adultery. In April 2000, a trial ensued on the remaining issues. Julie does not appeal the chancellor's ruling as to the judgment of divorce. Her appeal stems from the chancellor's ruling on various issues including the admission and exclusion of certain evidence, denial of a motion to amend the complaint, the prenuptial agreement, the award of legal custody to Ray, and the distribution of the marital assets. After careful review, we affirm the judgment.

## FACTS

¶3. Julie and Ray met in 1985. In June 1986, Ray's father died, and Julie, who is a CPA, worked on the estate. She also worked on Ray's finances and his successful 1987 campaign for Governor. Prior to their engagement, Julie worked at Eastover Corporation. However, she quit that position to start her own consulting firm and to spend time with her sick mother and Ray. She stated that Ray never asked her to quit her position but that he was happy when she left her job.

¶4. Julie and Ray were engaged in September 1986 and married on January 3, 1987. During the marriage, Julie kept meticulous records of the expenses. Julie claims that at the time of the marriage she did not know Ray's net worth nor did the prenuptial agreement have a schedule attached to it. On the day before their marriage, January 2, 1987, Ray

2

brought up the prenuptial agreement. Julie was sobbing, and she stated "So I can't remember exactly what happened. But he [Ray] knew that I was unhappy doing it [signing the agreement], and I said, I will show you that I love you; I worship and adore you; I'll show you that; I will sign the stupid agreement, but please, please tear it up; don't do this to me; please tear it up' he said Okay, okay, okay; and I said thank you...."

¶5.     Julie was a graduate of the University of Mississippi (Ole Miss) and received a B.A. degree in mathematics. She also analyzed financial statements while working in New York for Chemical Bank. She later attended Columbia University and received an M.B.A. in 1977. After receiving her M.B.A., Julie worked in the bond fund department at Merrill Lynch on Wall Street in New York. In the early eighties, Julie passed the Certified Public Accountant exam. Julie also taught money and banking courses at Mississippi College and the University of San Francisco, undergraduate level, and at Golden Gate University, graduate level. Eventually, Julie was employed by Eastover Corporation in Jackson.

¶6.     On cross-examination Julie stated that she kept a cash flow ledger for Ray. When questioned, Julie agreed that she knew Ray's spending habits and his income prior to the marriage. During the marriage, the Mabuses had nannies to help with the children and other staff to assist in operating the household. Julie testified at length about the couples' various accounts and assets. The Mabuses kept separate accounts throughout the marriage. The Mabuses had properties in Jackson and a vacant lot in Alabama. Julie testified that none of her money was used to purchase the property. The properties were, however, titled to both Julie and Ray.

3

¶7.    A number of witnesses testified at trial concerning the lifestyle and parenting skills of Julie and Ray. Julie had a teacher and a few neighbors testify on her behalf. Ray had Margie Cumberland, a housekeeper, and other witnesses to testify at trial. In addition, many witnesses testified as to their observations of the two Mabus children.

¶8.    Holmes Adams (Adams) testified concerning the prenuptial agreement. Adams, an attorney, has worked on wills, trusts and estate planning. Ray and Adams attended law school at Harvard together. When Ray's father died, Adams worked on probating the will and other estate matters. Adams described his relationship with Julie as cordial. In regard to the estate of Ray's father, Julie was the "point person."

¶9.    Adams stated that Ray called him because both Julie and Ray wanted a prenuptial agreement. Adams agreed to draft the agreement. Ray and Julie wanted to protect their separate property in the event of a divorce. According to Adams, the meeting took place a few months prior to the January 1987 wedding. He explained to both Julie and Ray that normally each person has their own attorney. However, both Julie and Ray stated that they were in agreement and an attorney was not necessary.

¶10.   At the meeting, a copy of the agreement was given to each person, and Adams went through every paragraph of the agreement. As they reviewed the agreement, Julie and Ray asked Adams questions. Adams distinctly remembered telling Julie and Ray that if they had any disagreement concerning the terms of the agreement, then they would have to get separate counsel. Adams advised the couple to prepare schedules of their assets and anticipated inheritance. At the time of the meeting, the schedules were not attached. He was

4

not present at the time of the signing of the agreement. The Mabuses did not send him a copy of the executed document.

¶11. Renee Haycraft (Haycraft) is a notary public and worked with Ray for many years. Ray asked her to witness the signing of the prenuptial agreement. On January 2, 1987, Haycraft went to Ray's home with her husband. When Haycraft and her husband arrived, Julie and Ray were hospitable. After chatting for a few minutes, Julie and Ray signed the document. Haycraft flipped through the document and was satisfied that it was complete and notarized it. She stated that at no time was Julie sobbing nor did Julie ask Ray to tear up the document.

¶12. A former political consultant for Ray, Harrison Hickman (Hickman) testified and provided an affidavit. In the fall of 1986 Harrison spoke to Julie and Ray about a prenuptial agreement that they would be signing. According to Hickman, Julie stated that they were having a prenuptial agreement because she wanted the agreement.

¶13. Dr. David Channell (Dr. Channell), a doctorate in finance and administration and current professor of business and economics at William Carey College in Hattiesburg, Mississippi, was an expert witness at trial. He examined Julie's educational background, work history, possible employment locations, and general skills. Based on the information, Dr. Channell testified that Julie could earn a median annual income of $108,450 ($90,000.00 salary with 20.5% in fringe benefits). In addition, he testified that her employability in the Jackson area is very high.

**STANDARD OF REVIEW**

¶14. When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review. *McNeil v. Hester*, 753 So.2d 1057, 1063 (Miss. 2000). This Court will not disturb the findings of a chancellor "unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Id*.

## DISCUSSION

**1. Whether the chancellor erred and abused his discretion in limiting evidence sought to be presented by Julie and allowing evidence sought to be presented by Ray to such an extent as to deny Julie a fair trial.**

¶15. Julie argues that the chancellor made erroneous rulings regarding evidentiary matters. Reviewing the rulings collectively, Julie suggests that the chancellor was manifestly wrong, abused his discretion and denied her a fair trial. Of particular concern, Julie argues that she was not allowed to present evidence of the children's excited utterances, rebuttal evidence against Dr. Wood Hiatt (Dr. Hiatt), Ray's expert witness, and evidence to explain her actions upon which Ray and Dr. Hiatt relied and presented to the court.

¶16. This Court has consistently held that an unsupported assignment of error will not be considered. *Ellis v. Ellis*, 651 So.2d 1068, 1072 (Miss. 1995). Julie did not cite any authority for her argument that the chancellor erred. This Court does not have to consider alleged error by when no authority is cited in the brief. *Armstrong v. Armstrong*, 618 So.2d 1278, 1282 (Miss. 1993). *See also Brown v. Miss. Transp. Comm'n*, 749 So.2d 948, 959 (Miss. 1999). Accordingly, this issue is procedurally barred.

**2. Whether the chancellor erred in excluding the testimony of Janna Findley Harris.**

6

¶17. Julie also argues that the chancellor erred by excluding testimony from Janna Findley Harris (Harris). Harris testified at a motion hearing before the court that she saw all of the Mabus family members and that she was a member of the American Association of Marriage and Family Therapists. Julie, however, argues that Harris's testimony was excluded because Harris indicated that she was a marriage counselor and had interviewed Ray. Julie maintains that Ray stated he only visited Harris as a courtesy. Accordingly, Julie contends that the fact that Harris is, among other qualifications, a marriage counselor, has no bearing on her ability to testify at court. In addition, Julie argues that the chancellor relied upon Miss. Code Ann. § 73-54-39 (2000 & Supp. 2002) to exclude the testimony and thus overlooked his previous ruling that Ray did not seek marriage counseling. Finally, she argues that Rule 803 and 804 of the Mississippi Rules of Evidence make the testimony admissible and that § 73-54-39 is unconstitutional.

¶18. The chancellor stated in the order that he considered "the Motion, the testimony of Janna Findley Harris, the handwritten notes taken by Ms. Harris during her office visits with Ray Mabus, portions of Mr. Mabus' deposition, the arguments of counsel both in support of and in opposition to the Motion, and the applicable authorities cited by counsel...." Based on his review of this information, the chancellor ruled that Harris was not permitted to testify. Therefore, the chancellor completed a comprehensive review of many documents and testimony in making his decision. In addition, the chancellor wrote to the parties, dated March 20, 2002, and had no question that Ray was involved in therapy with Harris. The

7

chancellor based his finding on his review of Harris's notes from the sessions and Ray's deposition testimony in which Ray referred to himself as a patient.

¶19.   Miss. Code Ann. § 73-54-39 states the following:

> If both parties to a marriage have obtained marriage and family therapy by a **licensed marriage and family therapist**, the therapist **shall not be competent** to testify in an alimony, custody or divorce action concerning information acquired in the course of the therapeutic relationship.

(emphasis added).  As to Julie's assertion that the chancellor overlooked his previous ruling that Ray had not sought counseling, the record reflects that the chancellor did not rule on that issue.  There had been a prior hearing before the chancellor concerning the issue of privilege.  The transcript testimony quoted by Julie in her brief relates to the issue of privilege and a motion for a protective order, not Harris's competence to testify pursuant to § 73-54-39.

¶20.   As to the constitutionality of § 73-54-39, the issue was not raised for the chancellor to consider.  "[T]his Court has also consistently held that errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned." *Ellis*, 651 So.2d at 1072 (citations omitted). Accordingly, this issue is barred from review. Notwithstanding the procedural bar, this issue still fails.  Julie claims that the rules of evidence supercede any statute concerning court procedure.  In effect, Julie claims that the chancellor's ruling disregards M.R.E. 803 and 804, which deal with hearsay exceptions. Here, the statute states that a licensed marriage and family therapist shall not be **competent** to testify, whereas the M.R.E. concern the exceptions to the hearsay rule.  There is no confusion or conflict between the statute and the rules.

8

¶21. Neither party cites M.R.E 601, which addresses the general rules of competency. There is no family therapist exception under this Rule. What is more, M.R.E. 1103 repeals any evidentiary rules inconsistent with the Rules of Evidence, regardless of whether they are provided in a statute, court decision or court rule. In the context of M.R.E. 601 and the statute, there does appear to be a conflict. However, this Court need not address an issue that is not properly raised by a party. *Ellis*, 651 So.2d at 1072 (citations omitted). Notwithstanding that the issue was not raised and is procedurally barred, this Court will none the less review the issue to determine if the exclusion of Harris's testimony prejudiced Julie's case.

¶22. The heart of Julie's argument is that Harris would have given testimony pertaining to the custody of the children and their alleged preference to live with Julie. In her brief Julie specifically stated that Harris's testimony would establish that (1) the children were bright and intelligent; (2) the eldest child was 14 years old in intelligence even though she was not yet 12 years of age; and (3) the children preferred to live with Julie. At trial, other witnesses testified to these facts. Accordingly, to the extent that there may have been any prejudice to Julie's case, it was harmless.

¶23. Two expert witnesses testified during the trial. Dr. Donald Guild (Dr. Guild) was the expert witness for Julie, and Dr. Hiatt was the expert for Ray. Dr. Guild testified that the children were very bright and intelligent and had stronger emotional ties to Julie. When considering the *Albright* factors, Dr. Guild stated that the sex of the children was significant and the children should be with Julie. Dr. Guild disagreed with Dr. Hiatt's assessment of

9

the children. In his testimony, Dr. Guild suggested that Julie have physical custody of the children, not Ray. Nancy McNamee, another witness called by Julie, testified that the children were upset, i.e. crying and running down a hall in their home, when they learned of a modification to visitation at least six months prior to the hearing before the chancellor. Judy Menist, the children's teacher, stated that the children were intelligent. Julie had a loving relationship with them.

¶24. Dr. Hiatt testified that the children were bright and intelligent. In making his evaluation, he also considered the fact that the eldest child expressed her desire to live with Julie. Ultimately, however, Dr. Hiatt recommended that Ray be given custody of the children. The chancellor had an opportunity to consider all the testimony from various witnesses and the differing recommendations for custody by the experts. The testimony by these witnesses contains the same information that Harris was to have given the chancellor. Even though Harris was prohibited from testifying in the case, her testimony would have been redundant to the testimony given by other witnesses. This issue is without merit.

### 3. Whether the chancellor erred in admitting the testimony of George Bougher.

¶25. Julie argues that the chancellor abused his discretion and committed manifest error by allowing George Bougher (Bougher) to testify. She contrasts the chancellor's refusal to permit Harris to testify with the admission of Bougher's testimony. Of significance is that Bougher testified that he did not have any special designation in the area of marriage and family counseling. He is a psychotherapist and a licensed professional counselor. During voir dire, he stated that he is not considered a marriage family therapist, but works with

10

groups, individuals couples or families. The chancellor accepted Bougher as an expert in the field of counseling only. In addition, the parties both signed waivers in this case. This issue is without merit.

### 4. Whether the chancellor erred in relying upon the testimony of Dr. Wood Hiatt.

¶26. Julie argues a number of alleged errors by the chancellor pertaining to Dr. Wood Hiatt's (Dr. Hiatt) testimony. Dr. Hiatt is a psychiatrist who testified at trial. Julie claims that Dr. Hiatt had previously testified in her favor, but changed his opinion by the time of trial. She also claims that the chancellor relied heavily upon Dr. Hiatt's testimony as is reflected in the court's opinion. Further, Julie argues that Dr. Hiatt's testimony is flawed because he never interviewed her. She alleges that Dr. Hiatt relied on many remote facts, apart from interviews with the children and the January 1998 tape between the Mabuses and a priest. She claims that had Harris been allowed to testify, it would be clear that custody should have been granted to Julie. Further, Julie asserts that Dr. Donald Guild (Dr. Guild) disagreed with Dr. Hiatt and that physical custody should go to her with Julie and Ray sharing joint legal custody.

¶27. As to the claims that Dr. Hiatt had previously testified that Julie was preferred for custody on a 52% to 48% basis and then changed his testimony by the time of trial in favor of Ray, the record does show that Dr. Hiatt made an overall recommendation at trial that Ray have physical custody of the children. However, Dr. Hiatt's testimony concerning the alleged 52% to 48% recommendation in favor of Julie concerns just one *Albright* factor.[1]

---

[1]*Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983).

Julie cites to the transcript for authority; however the transcript testimony by Dr. Hiatt, states:

> Q. You have here, back to number 9, the home, school and community record of the child.
> A. Yes, sir.
> Q. Even.
> A. Yes, sir.
> Q. In your deposition, you gave Mrs. Mabus a slight edge, I believe.
> A. Okay.
> Q. Fifty-two to forty-eight.
> A. Okay, fifty-two to forty-eight.
> Q. And the stability of the home and employment, you gave a plus to Ray on that.[2]
> A. Correct.
> .....

The transcript does not indicate that Dr. Hiatt recommended Julie should have custody of the children. It only indicates that Julie had a marginal preference on that one factor.

¶28. Julie also claims that the chancellor relied upon Dr. Hiatt's testimony in his opinion. While it is true that the chancellor mentions that the court heard testimony from various individuals on various topics considered in the *Albright* factors, the chancellor's only specific reference to Dr. Hiatt is found under the moral fitness of the parents factor. The chancellor stated, "Defense's expert, Dr. Wood Hiatt, testified that he believed the older daughter was aware of the affair based upon his interviews with the children." There is no further mention of Dr. Hiatt in the opinion. In fact, the chancellor appears to suggest that the high volume of telephone calls combined with the intelligence of the children would make the children curious of their mother's behavior. The chancellor also indicated that the

---

[2]This is another *Albright* factor. See the child custody issue that follows for further factors.

affair interfered with effective parenting of the children regardless of whether the children knew of the affair.

¶29.    Julie also places importance on the evidence used by Dr. Hiatt to form his opinion. She is correct in stating that Dr. Hiatt never interviewed her.  At trial, Dr. Hiatt testified that he requested interviews with Julie but that he never had any with her.  However, Dr. Hiatt relied on more than the interviews with the children and the taped meeting between the Mabuses and the priest in formulating his opinion.   Dr. Hiatt relied on many sources for information such as interviews with Margie Cumberland, Ida Turnage, and the children. Dr. Hiatt actually interviewed the children 21 times starting in February 1998.  He reviewed the pleadings and relied upon statements by Julie.  He reviewed at least sixty depositions.  Dr. Hiatt testified that he was present in the courtroom and heard all the testimony at trial.  He took notes and listened to the testimony, and he based his opinion on *all* the evidence.  Dr. Hiatt testified that the substance of the depositions that he reviewed were much the same as the testimony given in trial.   In other words, the depositions and the testimony were cumulative.  Dr. Hiatt recommended that Ray have custody of the children.  Dr. Hiatt also testified to some of Julie's positive attributes.  He stated that Julie was able to care for the children and that Julie was described as loving and caring of the children.  He also stated that the Mabuses' parenting skills are equal.

¶30.    Finally, Julie argues that Harris's testimony, if allowed, would have demonstrated why she should have custody of the children.  This Court addressed the rationale for not allowing Harris to testify above and will not address it further.  As for the conflict in

13

testimony between Dr. Hiatt and Dr. Guild, the chancellor relied upon various testimony to reach his decision. It is not known to what extent each witness's testimony influenced the decision. However, the chancellor stated in his opinion: "This Court's desire to award joint legal and joint physical custody; however, neither party has petitioned for joint custody. Therefore, the requirements of § 93-5-24 of the Mississippi Code Annotated have not been met and this Court is precluded from granting joint custody."

¶31. This issue is without merit.

**5. Whether the chancellor erred by denying Julie's motion to amend her complaint.**

¶32. Julie next complains that the chancellor erred by denying her motion to amend the complaint to include joint legal custody. She alleges that this issue was tried by implied consent. Julie relies in part upon *Setser v. Piazza*, 644 So.2d 1211, 1217 (Miss. 1994), for implied consent authority. *Setser* concerned a child's emancipation and held that issues can be tried by implied consent pursuant to M.R.C.P. 15(b) even if the issue is not raised in the pleadings. *Setser*, 644 So.2d at 1217. "A finding that an issue was tried by implied consent depends upon whether the parties recognized that a new issue was being litigated at trial." *Id*. (citing *Shipley v. Ferguson*, 638 So.2d 1295 (Miss.1994)). However, implied consent will not be found where the "questions asked or the evidence presented at trial are relevant to the issues actually raised in the pleadings."*Id*. (citing *Shipley*, 638 So.2d at 1301).

¶33. Miss. Code Ann. § 93-5-24(3) (1994 & Supp. 2002) provides that in cases which do not involve irreconcilable differences, joint custody may be awarded, in the discretion of the court, upon application of one or both parents. The chancellor issued an Opinion and Order

14

of the Court on July 6, 2000, and awarded legal custody of the children to Ray and alternate six-month periods of physical custody to both Ray and Julie. On August 8, 2000, the chancellor issued the Judgment which incorporated by reference the previous opinion and order.

¶34. Prior to the final judgment, on July 24, 2000, Julie filed a motion to amend the pleadings to conform with the evidence. Julie claims that she filed the motion prior to the judgment so that the court could consider joint legal custody. She asserts that the issue of joint custody was tried by implied consent. She claims that she never wanted anything but joint custody, which she stated on the first day of trial. Julie also argues that her expert, Dr. Guild, confirmed that desire at the conclusion of the trial. In addition, she claims that Ray never objected to this testimony and was not prejudiced by it.

¶35. M.R.C.P. 15(b) concerns amending the pleadings to conform with the evidence and states:

> (b)    Amendment to Conform to the Evidence. When issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in the maintaining of his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. The court is to be liberal in granting permission to amend when justice so requires.

¶36.    Ray argues that two isolated statements, one during Julie's testimony and the other in the rebuttal testimony of her expert, do not amount to implied consent. Ray further argues that the two parties requested sole legal and physical custody in all pleadings and that no witness testimony addressed the possibility of joint custody.  Further, Ray argues that he did object to the testimony of the witness.  The record reveals that counsel for Ray objected to the testimony of Dr. Guild on rebuttal claiming that the testimony should have been presented in Julie's case-in-chief.   Counsel also objected to Dr. Guild giving a recommendation. (Dr. Guild recommended that Julie have physical custody and that there be joint legal custody of the children with a guardian ad litem.). The chancellor allowed testimony on limited issues.

¶37.    A hearing on the motion occurred on October 31, 2000.  The chancellor listened to arguments from both parties and stated in part:

> All right. Mr. Ross, I'm in agreement with what Mr. Roberts said in this case. Both sides fought for six days, not including the motions that we tried, each one determined to get sole legal and sole physical custody.  And even after the case was over, I remember getting with the lawyers in chambers and suggesting that they prepare some proposal in case I decide I wanted to award joint legal and/or physical custody.  Now, Mr. Roberts at that point said he doubted that they were going to address the issue, that they were going to go all the way for sole legal and sole physical custody.  I think Mrs. Thibodeaux and Mr. Crockett possibly said that they would make a proposal. I'm not even sure how that went.  But anyway, what it boiled down to was we were still in the situation of both fighting for sole custody, legal and physical.  And the case law I later found out - - I didn't know - - I thought I had the authority at that time to go ahead and award joint legal and/or physical custody if I felt that that was the proper thing to do. But I later found out that that was not what the case law said and it had to be one or the other.  And that's the reason I did it the way I did.  And based on that, I'm going to overrule your motion.

16

The chancellor entered an order denying the motion on January 8, 2001. In his ruling dated

January 8, 2001, the chancellor stated:

> Regarding Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence, the Court finds that both parties sought sole legal and physical custody at the trial of this cause. Even in Chambers, after the Court asked the attorneys for both parties to consider joint legal and/or physical custody, both parties rejected the opportunity. Therefore, the Court finds that Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence shall be and is hereby DENIED.

Clearly, mentioning a variation in custody in no more than two instances does not rise to

implied consent. Ray objected to and had a continuing objection to Dr. Guild's testimony.

All the pleadings and testimony, apart from Julie's assertion given during cross-examination,

did not address joint custody. In fact, both parties maintained that they wanted sole custody

of the children. The intent of the parties was clear, and to allow an amendment at such late

date and after the initial findings would be prejudicial. This issue is without merit.

### 6. Whether the chancellor erred in awarding legal custody to Ray and alternate physical custody to Julie.

¶38. The standard of review in cases involving child custody is limited. ***Lee v. Lee***, 798

So.2d 1284, 1288 (Miss. 2001) (collecting authorities). Reversal occurs only when the

chancellor is manifestly in error or has applied an erroneous legal standard. ***Id.*** The evidence

and credibility of a witness is the sole responsibility of the chancellor as well as the weight

of this evidence. ***Id.*** In ***Lee***, this Court set forth the ***Albright*** factors and held the following:

> To help guide us to a proper determination as to custody, the court considers the following factors in determining the child's best interests: (1) age, health and sex of the child; (2) a determination of the parent that has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child

17

care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship. *Albright v. Albright*, 437 So.2d 1003, 1005 (Miss.1983). While the *Albright* factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula. Determining custody of a child is not an exact science.

798 So.2d at 1288. However, "[g]iven our standard of review, we need not reexamine all of the evidence to see if we agree with the chancellor's ruling; our charge is merely to see if the chancellor's decision is supported by credible evidence." *Id*. at 1289.

¶39. The chancellor devoted over seven pages of his opinion to the child custody issue. In his opinion, the chancellor made a thorough and detailed analysis of each *Albright* factor apart from factor 9, the preference of the child at the age sufficient to express a preference by law, which the chancellor found inapplicable. The end result of his analysis was that Ray should receive legal custody and Julie and Ray have alternate six (6) month periods of physical custody of the children. Julie's argument merely re-analyzes the *Albright* factors with a different outcome. Not surprisingly Julie's analysis finds that she should have custody of the children. A brief review of the chancellor's findings follows:

(1) Age, health and sex of the child.

¶40. The chancellor found that both parents were capable of caring for the children's health and that the sex of the children slightly favored Julie. The children were seven and nine at the time of the proceedings, female and in good health with the exception of one

18

child having asthma, and beyond the tender years exception. The chancellor also found that while it is important that Julie have an active role in the children's lives and upbringing, it was not paramount that she have full custody.

> (2)   A determination of the parent that has had the continuity of care prior to the separation.

¶41.   The chancellor found that the testimony was conflicting but the factor weighed evenly for Julie and Ray.

> (3)   Who has the best parenting skills and which has the willingness and capacity to provide primary child care.

¶42.   The chancellor found this factor to weigh evenly for Julie and Ray. Both parents were determined to be willing and capable of providing primary care for the children.

> (4)   The employment of the parent and responsibilities of that employment.

¶43.   The chancellor found that this factor weighed evenly for Julie and Ray. While neither parent had a typical nine to five job, the chancellor determined that each can impart a strong work ethic to the children.

> (5)   Physical and mental health and age of the parents.

¶44.   The chancellor found that this factor slightly favored Ray. The chancellor found that Julie and Ray had good physical health. In addition, Ray was determined to have good mental health. As for Julie, the chancellor found that there was some evidence that she has some anger management problem and that the stress of the proceedings and the circumstances had taken a toll on her mental health and stability.

> (6)   Emotional ties of parent and child.

19

¶45. The chancellor found this factor weighed evenly for Julie and Ray. The chancellor stated that there was much testimony from neighbors, friends, relatives and doctors. It was clear that the children were bonded to both parents. Also, the chancellor indicated that witnesses for each party attempted to describe a stronger tie to one parent over the other. However, the chancellor noted that none of these witnesses observed the children in separate settings with each parent.

(7)     Moral fitness of the parents.

¶46. The chancellor found this factor weighed in favor of Ray. A divorce was granted on the grounds of uncondoned adultery. Nevertheless, the chancellor specifically stated that "[w]hile it is not the purpose of this Court to punish adultery, it is a factor to consider in awarding custody of minor children." The chancellor concluded that the affair interfered with Julie's ability to effectively parent, regardless of whether the children knew of it.

(8)     The home, school and community record of the child.

¶47. The chancellor found this factor weighed evenly for Julie and Ray. The children were determined to be exceptional and well adjusted, but neither parent could take sole credit for that accomplishment.

(9)     The preference of the child at the age sufficient to express a preference
        by law.

¶48. The chancellor found this factor inapplicable since neither child was of an age to express a preference.

(10)     Stability of home environment and employment of each parent and
         other factors relevant to the parent-child relationship.

¶49. The chancellor found the stability factor weighed evenly for Julie and Ray. Both have fine homes to raise the children. As for the marital domicile, the chancellor found that it was an appropriate place to raise the children before the separation and continued to be an appropriate place. The homes and employment records of both parents were stable.

(11) Other considerations.

¶50. The chancellor considered other aspects of the evidence. Some of the things considered included Julie's interference with Ray's time as well as her care of the girls since the separation.

¶51. The chancellor considered all of the above factors. The best interests of the children were considered, and Ray was determined to be the more appropriate parent to have legal custody. Julie's arguments, for the most part, cites testimony that results in her conclusion that she has a stronger and more favorable outcome than Ray in every *Albright* factor, except for the moral fitness factor in which she considers both parents to be equal. Appellate review is limited in custody cases. *Lee*, 798 So.2d at 1288. The chancellor heard the testimony of all witnesses and had the opportunity to observe the demeanor of the witnesses for six days. Considering the evidence and credibility and the witnesses as well as the weight assigned is the responsibility of the chancellor. *Lee*, 798 So.2d at 1288. The appellate court reviews whether the chancellor's decision is supported by credible evidence. *Id*. at 1289. This Court reviews the chancellor's decision under an abuse of discretion standard and will not disturb the findings of a chancellor "unless the chancellor was

manifestly wrong, clearly erroneous, or applied the wrong legal standard." *McNeil v. Hester*, 753 So.2d at 1063.

¶52.	After a review of the voluminous record in this case and the chancellor's detailed opinion, we conclude that his findings are substantially supported by the record. Accordingly, we find that the chancellor's decision is not manifestly wrong, clearly erroneous, nor did he apply the wrong legal standard. Therefore, the chancellor did not abuse his discretion. This issue is without merit.

**7.	Whether the chancellor erred in ruling that the prenuptial agreement was valid and enforceable.**

¶53.	An antenuptial contract is just as enforceable as any other contract. *Smith v. Smith*, 656 So.2d 1143, 1147 (Miss. 1995). In an antenuptial contract the same construction and interpretation rules are applicable as well as the intent of the parties. *Estate of Hensley v. Estate of Hensley*, 524 So.2d 325, 327-28 (Miss.1988). "However, this Court imposed the requirement of fairness in the execution of such contracts." *Smith v. Smith*, 656 So.2d at 1147 (citing *Estate of Hensley*, 524 So.2d at 327). A duty to disclose is also of paramount importance. *Id*. (citing *Estate of Hensley*, 524 So.2d at 328). However, "[i]t is not now and never has been the function of this Court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Estate of Hensley*, 524 So.2d at 328 (citations omitted). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous

22

legal standard was applied." ***McBride v. Jones***, 803 So.2d 1168, 1170 (Miss. 2002) (quoting

***Holloman v. Holloman***, 691 So.2d 897, 898 (Miss.1996)).

¶54.    Julie argues that the chancellor erred in ruling that the prenuptial agreement was valid

and enforceable.  Her basic argument centers on her claim that she never saw the schedules

attached to the agreement until it was presented as evidence.  In other words, Julie claims

there was no full disclosure and that the agreement was not fair.  Julie also cites many other

considerations for this Court. Included among her complaints are her arguments that she had

no independent counsel; she sacrificed 13 years of her career for Ray; the agreement is

against public policy; the testimony of Haycraft, the notary, is suspect at best; the separate

estates are so disparate that fundamental fairness must be questioned; and the agreement

waives alimony.

¶55.    After presiding over a six-day trial and numerous other motion hearings, the

chancellor in this case wrote an extensive twenty-one page opinion and order.  He devoted

four pages to the prenuptial agreement and alimony.  The chancellor determined that the

prenuptial agreement was fair and enforceable.  The chancellor also noted that even if the

prenuptial agreement was not enforced, the ruling would have been the same citing the

Mabuses meticulous maintenance of separate premarital, gift and inheritance accounts.

¶56.    The chancellor found that "[t]he evidence shows that Julie wanted a prenuptial

agreement, understood the terms of the agreement, and knew that she had a right to a

separate attorney.  However, Julie chose not to avail herself of an independent attorney and

she voluntarily executed the agreement to protect her own anticipated inheritance."  As to

Julie's claim that she signed the agreement only after Ray allegedly promised to destroy it, the chancellor stated that is not grounds for refusal to enforce the contract. The chancellor cited *Spragins v. Sunburst Bank*, 605 So.2d 777, 781 (Miss. 1992) for the principle that alleged fraudulent misrepresentation "cannot be predicated on a promise relating to future actions." An appellate court must respect the findings of fact made by a chancellor which are supported by credible evidence and are not manifestly wrong. *Rogers v. Morin*, 791 So.2d 815, 826 (Miss. 2001). In addition, "[t]he chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Id*. (quoting *Carter v. Carter*, 735 So.2d 1109, 1114 (Miss. Ct. App. 1999)).

¶57. The ruling is supported by substantial evidence and there is no abuse of discretion by the chancellor. Both Julie and Ray had some assets prior to the marriage and potential for further inheritance in the future. Ray and Julie were engaged in the fall of 1986 and married January 3, 1987. In June 1986, Ray's father died and left Ray, an only child, a substantial estate. A week after Julie and Ray were engaged, Julie's mother died, leaving an irrevocable trust for Julie and her two sisters. Upon the death of her father, Herman Hines, Julie will receive a one-third share of the trust estimated to be approximately $1.6 to 1.75 million at the time of trial. In addition, Julie had already received some stock from her father and is entitled to a one-third share of her father's estate upon his death.

¶58. Julie is a very well educated woman. She stated that she always liked numbers She has a Masters of Business Administration (M.B.A.) degree from Columbia University and a CPA certificate. She has worked on Wall Street at Merrill Lynch and taught graduate and undergraduate money and banking courses.

¶59. Julie testified that she prepared numerous documents pertaining to the estate of Ray's father, including completing tax return schedules for the estate. Ray stated that he paid Julie $3,000.00 for her work on his father's estate. Adams, the attorney for the estate of Ray's father, testified that Julie was the point person for the estate. In addition, Julie stated that "[o]ver the course of the marriage, probably even before we got married, I kept meticulous records about what we had, what we spent and what we got. I guess you could say I was the custodian of all the information...." Despite these statements Julie argues that there was no full disclosure and that the schedule of assets were not attached to the agreement when she signed it.

¶60. About October of 1986, Julie and Ray went to Adams's office and discussed a prenuptial agreement. Adams stated that Ray called and stated that both Julie and he wanted a prenuptial agreement, and Adams agreed to draft the agreement. Ray and Julie wanted to protect their separate property in the event of a divorce. Adams stated that normally each party has their own attorney, however, Julie and Ray stated that they were in agreement and an attorney was not necessary. While at the meeting, Adams gave each of them a copy and explained each paragraph of the agreement. In addition, Adams distinctly remembered telling Julie and Ray that if they had any disagreement concerning the terms of the

agreement, then they would have to get separate counsel. At the time of the meeting, the schedules were not attached, so Adams advised the couple to prepare schedules of their assets and anticipated inheritance. After the meeting, Adams stated that he called Julie to discuss the progress of the schedule. Julie told him that she and Ray were in the process of preparing the schedules. Ray testified that he and Julie compiled the list together on January 1, 1987. Ray also claimed that Julie typed the schedule on his typewriter. The prenuptial agreement itself states that the parties acknowledge that they received a complete financial disclosure from one another.

¶61. Hickman, a former political consultant, stated that in the fall of 1986 Julie and Ray told him about a prenuptial agreement that they would be signing. According to Hickman, Julie stated that they were having a prenuptial agreement because she wanted the agreement.

¶62. On January 2, 1987, Haycraft went to Ray's home with her husband to notarize the prenuptial agreement. After chatting for a few minutes, Julie and Ray signed the document. Haycraft flipped through the document and was satisfied that it was complete and notarized it. Haycraft stated that at no time was Julie sobbing nor did Julie ask Ray to tear up the document.

¶63. The chancellor is in the best position to observe a witness and determine the witness's credibility and the weight to be given to evidence presented by a witness. *Rogers*, 791 So.2d at 826. Although Julie claims that she had no attorney, the chancellor correctly determined that pursuant to *Hensley* independent counsel is not required to fairly execute a prenuptial agreement. After listening to the testimony, the chancellor determined that Julie wanted the

26

prenuptial agreement, understood the agreement and chose not to seek independent counsel. As for Julie's claims that there was no full disclosure and the agreement was not fair, the chancellor, after listening to all the testimony from the numerous witnesses and being in the position to observe the witness's demeanor and weigh the evidence presented, determined that the agreement was valid and enforceable and impliedly determined that the agreement was fair and the parties were provided full disclosure. As to Haycraft's testimony, the chancellor was in the best position to determine the credibility of the witness and the weight given to her testimony about the day the prenuptial agreement was signed by Julie and Ray and notarized by her. In other words, the chancellor resolved any disputes or conflicts in the testimony and evidence presented.

¶64. The chancellor also acknowledged that Julie's estate is smaller than Ray's and that she gave up her rights to alimony in the agreement.[3] However, the chancellor determined that Julie freely negotiated the agreement, and the chancery court would not relive her of the obligation even if it was a bad bargain. The claim that the estates of the parties are so disparate that it questions fundamental fairness is of no consequence. An antenuptial agreement is as enforceable as any other contract in Mississippi. *Smith*, 656 So.2d at 1147. Of course, there must be fairness in the execution and full disclosure in an antenuptial agreement in Mississippi. *Id*. Both Julie and Ray signed a valid agreement. Had the tables been turned and Julie's estate increased in value while Ray's estate decreased in value from the time of the agreement, Julie would presumably want this Court to uphold the agreement

---

[3]The issues of alimony and equitable distribution will be discussed further in the next issue.

to her benefit. The parties made this agreement to protect their assets. The fact that over time one party had the fortune of increasing their assets is not a reason to abolish or invalidate the agreement. At the time the agreement was made the parties wanted to protect premarital and inheritance assets, the agreement has done exactly what it was intended to do. All contracts involve some type of risk; this agreement was no different.

¶65. As for the alimony issue, the chancellor relied on case law and gave detailed reasoning for his decision. The chancellor stated in part:

> [T]his Court would not award alimony even absent the prenuptial agreement. The Mississippi Supreme Court has held that the Court need not award alimony "if there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties." *Johnson v. Johnson*, 650 So.2d 1281, 1287 (Miss. 1994). Julie has approximately $800,000 in liquid assets in her own name, will receive a portion of the marital estate in equitable distribution, receives annual dividends of approximately $20,000, and has substantial earning capacity. After considering Julie's total estate, as well as her adultery, this Court finds that she will be adequately provided for without and award for alimony. Therefore, even absent the prenuptial agreement, the results would be the same given the circumstances and the law.

While the prenuptial agreement is controlling, the standard of review for alimony will nevertheless be applied as stated in our case law. "Our scope of review of an alimony award is well-settled. Alimony awards are within the discretion of the chancellor, and his discretion will not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion." *Ethridge v. Ethridge*, 648 So.2d 1143, 1145-46 (Miss. 1995)(citing *Armstrong v. Armstrong*, 618 So.2d 1278, 1280 (Miss.1993)). *See also Voda v. Voda*, 731 So.2d 1152, 1154 (Miss. 1999); *Traxler v. Traxler*, 730 So.2d 1098, 1104 (Miss. 1998); *Parsons v. Parsons*, 678 So.2d 701, 703 (Miss. 1996). The ruling of the

chancellor will not be disturbed if the findings of fact are supported by credible evidence in the record. *Id*.

¶66. The chancellor did not abuse his discretion in finding the prenuptial agreement to be enforceable, but even pursuant to Mississippi case law, we find that the chancellor was not manifestly wrong or abuse his discretion on the issue of alimony. A divorce was granted to Ray on the grounds of uncondoned adultery. The chancellor only briefly mentioned the adultery. This Court has set forth criteria for the assessment of lump sum and periodic alimony:

> In *White v. White*, 557 So.2d 480, 483 (Miss.1989), we listed several factors to be considered by the chancellor in determining whether to award lump sum alimony and amount:
>
> 1. Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. *Tutor v. Tutor*, 494 So.2d 362 (Miss.1986); *Schilling v. Schilling*, 452 So.2d 834 (Miss.1984);
> 2. A long marriage. *Jenkins v. Jenkins*, 278 So.2d 446 (Miss.1973); *Tutor* and *Schilling*, supra;
> 3. Where the recipient spouse has no separate income or the separate estate is meager by comparison. *Jenkins*, *Tutor* and *Schilling*, supra;
> 4. Without the lump sum award the receiving spouse would lack any financial security. *Abshire v. Abshire*, 459 So.2d 802, 804 (Miss.1984).
>
> A closer analysis of these cases, however, reveal that the single most important factor undoubtedly is the disparity of the separate estates.
>
> Also, *Cheatham v. Cheatham*, 537 So.2d 435, 438 (Miss.1988); *Retzer v. Retzer*, 578 So.2d 580, 592 (Miss.1990).

*Cleveland v. Cleveland*, 600 So.2d 19, 197 (Miss. 1992).

29

¶67.    The Court in *Cleveland* applied the factors to a wife that was granted a divorce from her husband on ground of habitual cruel and inhuman treatment. Unlike the wife in *Cleveland*, Julie was determined to be at fault for uncondoned adultery. Ray was given the divorce because of Julie's wrongdoing. This Court had held that "[i]t is a general rule that alimony will not be allowed a wife when the husband is granted a divorce because of her fault." *Retzer v. Retzer*, 578 So.2d 580, 592 (Miss. 1990)(citations omitted). Nevertheless even if Julie were granted the divorce, she cannot satisfy the test set out in *Cleveland*. *See also Retzer v. Retzer*, 578 So.2d 580, 592 (Miss.1990); *Cheatham v. Cheatham*, 537 So.2d 435, 438 (Miss.1988).

¶68.    In his opinion, the chancellor acknowledged Julie's contributions to the marriage. Julie filed for divorce in 1998 and moved out of the marital home shortly thereafter. The chancellor granted a divorce in July 2000. Thus the Mabuses were together for approximately eleven years, not a long marriage. Julie is a highly educated woman with numerous degrees and an M.B.A. from Columbia University. Her earning capacity is significant based on her fine education and abilities. In addition, Julie had other assets and separate income. Furthermore, the chancellor's award of marital property was slightly in Julie's favor.[4] All these factors make Julie a financially secure person. Consequently, Julie was adequately provided for even with no award of alimony. As the chancellor determined in his opinion, Julie is not left destitute.

---

[4]This issue is addressed more fully in the equitable distribution issue.

¶69. The issue of disproportionality of the estates is more fully addressed in the final issue concerning equitable distribution reviewed by this Court. However, the chancellor acknowledged in his opinion that Julie made contributions to the family and Ray's success. In addition, the chancellor stated that even though Julie was not entitled to alimony, "the Court considered the disparity of the separate estates and will make a property division which will eliminate the need for any periodic payments, with the exception of child support obligations."

¶70. The chancellor listened to the testimony of witnesses and considered the evidence. The chancellor's ruling was supported by substantial evidence, and there is no evidence that the ruling was an abuse of discretion, was manifestly wrong, clearly erroneous, or that an erroneous legal standard was applied. Consequently, the prenuptial agreement was correctly determined to be valid and enforceable. We find that this issue is without merit.

**8.      Whether the chancellor erred in the distribution of marital assets.**

¶71. The prenuptial agreement was determined to be valid and enforceable by the chancellor. This determination is affirmed. Both Julie and Ray agreed to the arrangement and signed the prenuptial agreement in 1987. Accordingly, the prenuptial agreement is controlling in the distribution of the assets. The agreement stated in part the following:

> This agreement is intended to cover and apply to all property now owned by each party and to all property which each may acquire in his or her sole and separate right, and to any property acquired by an exchange, lease, mortgage or otherwise, to any property vesting by purchase, reinvestment, substitution, increase, descent, gift, bequest, or devise, and to proceeds derived from any sale. The agreement does not apply to property as to which title is taken after their marriage in the names of both parties as joint tenants or tenants by the entirety.

31

While the chancellor upheld the agreement, he noted that his decision on the distribution of marital assets would have been the same even if the agreement was determined to be unenforceable. Of vital importance in the case sub judice is evidence that the parties' "meticulously maintained separate accounts for their premarital separate property and for the gifts and inheritances that they each received during the marriage." Again, the chancellor wrote a very detailed opinion with more than six pages devoted to the distribution of assets. The chancellor's equitable distribution analysis considered the *Ferguson* factors. *See Ferguson v. Ferguson*, 639 So.2d 921, 928 (Miss. 1994).

¶72. There is a limited standard of review on appeal for issues addressing the division and distribution of property in divorces. *Owen v. Owen*, 798 So.2d 394, 397 (Miss. 2001) (citing *Reddell v. Reddell*, 696 So.2d 287, 288 (Miss.1997)). The chancellor's ruling of the division and distribution "will be upheld if it is supported by substantial credible evidence." *Id*. (quoting *Carrow v. Carrow*, 642 So.2d 901, 904 (Miss.1994)). "This Court will not substitute its judgment for that of the chancellor '[e]ven if this Court disagree[s] with the lower court on the finding of fact and might ... [arrive] at a different conclusion.'" *Id*. at 397-98 (quoting *Richardson v. Riley*, 355 So.2d 667, 668 (Miss.1978)).

¶73. When reviewing the *Ferguson* factors, a chancellor may consider only the factors that he or she deems to be applicable to the property placed before the chancery court's consideration. *Id*. at 398. Accordingly, not all of the eight factors must be considered in every case. *Id. Ferguson* set forth the following guidelines to assist a chancellor in the evaluation and distribution of assets:

Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
   a. Direct or indirect economic contribution to the acquisition of the property;
   b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
   c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

33

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson v. Ferguson*, 639 So.2d 921, 928 (Miss. 1994).

¶74. The chancellor determined that while Ray paid most of the consideration for the assets, Julie nevertheless made substantial contributions to the family and Ray's success. Each party was determined to have expensive tastes and expended the marital assets. There was no emotional ties to the marital property, and the value is discussed in a subsequent paragraph. The chancellor enforced the prenuptial agreement, which provided for each party to keep property brought to the marriage as well as separate inheritance and gifts. The chancellor acknowledged that Ray had an estate that was substantially larger than Julie's estate, and the chancellor considered this factor to be important in the analysis.[5] There were no unique tax or economic consequences. Further, the chancellor stated that he previously addressed the issue of assets and considered that Julie receives some dividends and had substantial earning capacity considering her education and skills. The chancellor also considered finality and stated that Julie was not entitled to alimony, but that disparity of the estates was considered and the property division would eliminate the need for periodic payments with the exception of child support payments.

¶75. The chancellor divided the marital property. The Mabuses had three pieces of real property, a pension account, some marital debt and personal property considered by the

---

[5]The chancellor stated that Ray's estate was valued at $8 to 9 million and Julie's estate was valued at $500,000 to $600,000.

chancellor. The marital home was valued at $250,000 with no debt associated with it. A lot in Kiva Dunes, Alabama, was valued at $350,000 with no debt associated with it. Sixteen acres of land in Ridgeland was valued at $450,000 with no debt associated with it. However, there was a marital debt of $255,000 and Ray's pension. The chancellor divided the property as follows: Julie was to receive $125,000 in exchange for a quitclaim deed to the marital home; Julie was to receive the Kiva Dunes property valued at $350,000; Ray was to receive the Ridgeland property valued at $450,000 and assume the $255,000 in marital debt; and Julie was to receive one half of Ray's pension[6] in the amount of $9,126.66. The parties split the personal property. The chancellor also ruled on the child support issue that Ray pay Julie the tax free sum of $4,100 per month in child support for the months that she had physical custody of the children, $1,200 per month for the months Ray had physical custody of the children, and Ray was to pay the children's tuition for private school and medical insurance.

¶76.    Julie argues that the chancellor should have considered marital and non-marital assets; alimony, especially in light of Julie's sacrifice of 13 years of life for Ray's political career; and the disparity of the estates. She argues that she aided in the management of his father's estate, participated in his political career for 13 years without compensation, and helped to keep his books on investments and contributed to the appreciation of Ray's assets.

---

[6]Ray had approximately 14.25 years service towards his pension. Ray and Julie were married for 5 of the 14.25 years service in which Ray receive the pension benefits. The chancellor determined that 5 years equaled approximately 35% of the total pension balance of $52,023. Therefore, the chancellor determined that Julie received half of $18,253 for a total of $9,126.66.

Julie contends that she relieved Ray of many details concerning reporting, record keeping and decision making on the utilization of the assets.

¶77. Ray argues that Julie never lived a life of sacrifice during their marriage. He cites to the testimony that there always was domestic help during the marriage, the children always had a nanny, he paid for the expenses, and he did not prevent her from working. Ray contends he had received his inheritance prior to the marriage. Furthermore, Ray argues that Julie received approximately 60% of the marital assets ($484,126.66), even though she made no financial contribution to the acquisition of the property, whereas Ray received approximately 40% of the assets ($329,126.66). In addition, he claims there was no transmutation of separate property into marital property and cites the chancellor's finding that the separate accounts were "meticulously maintained." As for any claim of increase in valuation of non-marital property during the marriage, Ray contends that there was no evidence presented by Julie. Without conceding his position, Ray argues that any increase in value to the gifted and inherited assets, was passive and not a result of Julie's contributions. Ray testified that Lanny Autry, a professional forester employed by Ray, managed and made the decisions concerning the timber property. Neither Ray nor Julie had expertise in timber management and any increase was not due to efforts by Julie or Ray. Likewise, Ray argues that any of his brokerage accounts were placed in a mutual fund selected by a broker.

¶78. The chancellor determined that the prenuptial agreement was valid and enforceable, as such, the agreed division of the property in the agreement is controlling. Coupled with the

36

agreement is the testimony of the maintenance of separate assets during the marriage. The

chancellor also determined that the property was maintained in separate accounts for their

premarital property as well as for gifts and inheritances received during the marriage. The

chancellor acknowledged that Ray used income from his inherited property to pay household

bills which became marital property. However, the chancellor noted that 'this did not

convert the remainder of Ray's separate property to marital property." The chancellor further

stated:

> Our Mississippi Supreme Court has ruled similarly in ***Johnson v. Johnson,***
> 650 So.2d 1281 (Miss. 1994), stating that funds used for the benefit of the
> family became marital property, but the funds and assets which were not so
> used remained separate. An entire inheritance does not become marital
> property merely because a portion of it was used for the benefit of the family.
> Each party's separate property is sufficiently identifiable and shall remain non-
> marital property not subject to equitable distribution. *See **A&L, Inc. v.
> Grantham***, 747 So.2d 832 (Miss. 1999).

Contrary to Julie's contention, the chancellor addressed the issues of Julie's contribution to

the marriage and disparity of the separate estates.[7] The chancellor in his ***Ferguson*** analysis

stated that "Julie's contributions will not be overlooked by this Court." The opinion further

stated that Julie " helped to keep the financial records for the family" and "made substantial

contributions to the family and to Ray's success." As to the disparity in the estates, the

chancellor specifically stated that "clearly, Julie's separate estate of gifts, inheritance, and

separate property is minor in comparison to Ray's separate estate. This Court considers this

factor to be important in the case at hand." The chancellor also considered the disparity of

---

[7]Alimony is addressed in the preceding issue.

the estates and stated that the court would make a property division which would eliminate the need for periodic payment, excluding child support payments.

¶79. Julie argues that she contributed to the appreciation in value of Ray's non-marital assets. She testified that she worked on the estate of Ray's father. She could not remember if Ray had paid her for the work. Ray testified that he paid Julie $3,000 for her work on the estate. During the course of the marriage, Julie kept meticulous records of the expenses. However, there is no evidence that Julie handled the timber or brokerage assets other than to provided monthly accountings of all expenses and records. The chancellor had already noted Julie's contribution to the family in keeping track of the records. However, this does not amount to active participation in the increase of value of non-marital assets. Accordingly, this issue is without merit.

## CONCLUSION

¶80. For these reasons, the judgment of the Hinds County Chancery Court, First Judicial District, is affirmed.

¶81. **AFFIRMED**.

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., DIAZ, CARLSON AND GRAVES, JJ., CONCUR. COBB, J., CONCURS IN RESULT ONLY. WALLER, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**