# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01464-COA

**IN THE INTEREST OF M.M., A MINOR:**                **APPELLANT**
**THOMAS McCOY**

**v.**

**ADAMS COUNTY YOUTH COURT**                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/23/2018 |
| TRIAL JUDGE: | HON. WALTER JEFFREY BROWN |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | LYDIA ROBERTA BLACKMON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ELGIN KENNETH WALLEY JR. |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 03/16/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2018-CA-01589-COA

**IN THE INTEREST OF C.M., A MINOR:**                **APPELLANT**
**THOMAS McCOY**

**v.**

**ADAMS COUNTY YOUTH COURT**                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/23/2018 |
| TRIAL JUDGE: | HON. WALTER JEFFREY BROWN |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY YOUTH COURT |
| ATTORNEY FOR APPELLANT: | LYDIA ROBERTA BLACKMON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ELGIN KENNETH WALLEY JR. |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 03/16/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

NO. 2018-CA-01596-COA

**IN THE INTEREST OF T.G.M., A MINOR:**                                    **APPELLANT**
**THOMAS McCOY**

**v.**

**ADAMS COUNTY YOUTH COURT**                                              **APPELLEE**

DATE OF JUDGMENT:                  07/23/2018
TRIAL JUDGE:                       HON. WALTER JEFFREY BROWN
COURT FROM WHICH APPEALED:         ADAMS COUNTY YOUTH COURT
ATTORNEY FOR APPELLANT:            LYDIA ROBERTA BLACKMON
ATTORNEY FOR APPELLEE:             OFFICE OF THE ATTORNEY GENERAL
                                   BY: ELGIN KENNETH WALLEY JR.
NATURE OF THE CASE:                CIVIL - CUSTODY
DISPOSITION:                       AFFIRMED - 03/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     On December 28, 2017, the Youth Court of Adams County adjudicated Thomas

McCoy's children, M.M., C.M., and T.G.M.,[1] neglected children as defined by Mississippi

Code Annotated section 43-21-105(1) (Supp. 2017).  The adjudication of neglect resulted

from an anonymous report and a subsequent investigation by the Mississippi Department of

Child Protection Services (MDCPS) which substantiated the allegations of neglect.

Additionally, the youth court entered a disposition order on December 28, 2017, wherein

physical custody of the minor children was placed with their maternal grandfather, Tommy

---

[1] Initials are used to protect the identity of the minor children.

McElroy Sr. The disposition order adopted a permanency plan for the reunification of McCoy and his minor children and a concurrent plan of durable legal custody or legal guardianship with a third party. Pursuant to the disposition order, McCoy was ordered to enroll in the youth court's family drug court program in furtherance of the reunification plan and his MDCPS service agreement to re-gain custody of M.M., C.M., and T.G.M. On July 23, 2018, the youth court entered two permanency orders and one amended permanency order in which the youth court ordered that physical and durable legal custody of each of the three minor children be vested with their maternal grandfather consistent with the previously ordered concurrent plan.[2] The permanency orders and amended permanency order were entered as a result of McCoy's non-compliance with his MDCPS service agreement and his disregard for the recommendations of the family drug court program's staff.

¶2.     Aggrieved by the youth court's adjudication order, permanency orders, and amended permanency order, McCoy appealed. Finding no error in the youth court's decision to deny McCoy's request to "accept notice of out of time appeal" regarding the adjudication order dated December 28, 2017, we affirm. Therefore, this court does not have jurisdiction over any issues stemming from the adjudication order, and those issues are not properly before this Court on appeal. Further, finding no error in the youth court's decision to amend the permanency plan for M.M, C.M., and T.G.M. from reunification with their father to durable

---

[2] The youth court entered a separate order for each child on July 23, 2018, to establish durable legal custody with the maternal grandfather. The orders for C.M. and T.G.M. were styled as permanency orders and the order for M.M. was styled as an amended permanency order. Despite the difference in title, all three orders accomplished the same result of durable legal custody.

legal custody with McElroy Sr., their maternal grandfather, we affirm.

## FACTS AND PROCEDURAL HISTORY

### Initial Allegations and Adjudication Hearing

¶3.　　On June 16, 2017, an anonymous report was made to the MDCPS regarding the unlivable condition of McCoy's home and the neglect of his three minor children, M.M., C.M., and T.G.M.  McCoy was a single father living on disability due to a prior back injury.  McCoy was also the primary custodian of M.M., C.M., and T.G.M. following the untimely death of the children's biological mother.  Kimberly Green, the initial MDCPS case worker assigned to the case, testified at the adjudication hearing that MDCPS had received multiple reports regarding McCoy's family, but she only testified specifically to the contents of the most recent report at the hearing.  The most recent report stated in part:

> [T]he kids are malnourished.  They do not eat their three meals a day.  The grass is waist high.  Inside the home, there are clothes everywhere on the floor.  The kitchen table is nasty and the smell is unpleasant.  In addition, the home is roach infested and the home may have rats.  The reporter stated a report was made in May and no one has come.  He emphasized the home is not livable for the children.

According to Green, she drove to McCoy's home on multiple occasions in furtherance of investigating the allegations in the report; however, she did not make contact with McCoy until June 23, 2017.  On that day, Green spoke with McCoy and two of his minor children[3] regarding the most recent report and conducted a cursory on-site investigation of the condition of the home.  Although Green did not see any roaches or rats, she substantiated the

---

[3] Green was only able to speak with M.M. and C.M.  T.G.M. is a special-needs child and is non-verbal.  He has a medical condition called Creatine Transporter Deficiency.

allegation that the conditions of the home were not livable for the minor children. She

testified:

> [T]he grass was in need of cutting. The yard had a lot of different objects and things in there. The home had clothes everywhere all on the floor. You couldn't even walk further passed the kitchen area. The kitchen table was full of food that was opened and left on the counters.

McCoy voluntarily took the children to their maternal grandmother, Tammy Melton's home

on the day of Green's visit. On October 9, 2017, the Adams County prosecuting attorney

filed a petition alleging that McCoy's three children were neglected children as defined by

Mississippi Code Annotated section 43-21-105(1). More specifically, the petition alleged

that the "[f]ather is unable to provide proper care for the children. [The] house is in disarray

and children are not eating properly. [The] children do not want to stay there." Shortly

thereafter on October 20, 2017, a custody-change order was entered placing custody of M.M.,

C.M., and T.G.M. with their maternal grandmother. Green was given a special assignment

in mid-August 2017 and was removed from McCoy's family's case prior to the adjudication

hearing on November 9, 2017.

¶4. Kadisha Hunt took over as the MDCPS case worker in Green's stead. Hunt testified

at the adjudication hearing that in the process of her investigation, the twelve-year-old

daughter, M.M., made several alarming disclosures regarding alleged sexual abuse by

McCoy. The child also made disclosures about McCoy's prescription drug use. M.M.'s new

disclosures raised additional concerns with MDCPS. As a result of M.M.'s disclosure

regarding sexual abuse, Hunt set up an interview for M.M. with the Child Advocacy Center

(CAC). Cherish McCallum, a forensic interviewer from the CAC, briefly testified at the

5

adjudication hearing regarding her forensic interview with M.M. The investigation regarding the allegations of sexual abuse was still ongoing at the time of the hearing, and for that reason, the youth court did not make a ruling on those abuse allegations. Hunt also testified that M.M. was briefly admitted to Brentwood because of suicidal threats brought on by the possibility of returning to her father's home.

¶5.    M.M. testified at the adjudication hearing and further substantiated the claims made in the initial report regarding the condition of McCoy's home. She alleged that McCoy told her and her siblings that "eating is a privilege" and "taking a bath is a privilege." According to M.M., there were times when there was no food in the house for them to eat, and she would be required to cook or find food for her and her siblings. She further testified about McCoy's use of prescribed medications and that she would sometimes accompany McCoy to buy and sell prescription medications. M.M. was able to identify and recite the names and locations of the people that she and McCoy would see and places they would go to buy and sell the medications. Further, M.M. described the colors, shapes, and sizes of the pills and patches, as well as the method in which McCoy administered his medication. According to M.M., McCoy would cut the Fentanyl patches into strips and chew on them for a faster release of the medication. Finally, M.M. testified that there were several occasions when she and her siblings were physically abused by McCoy. M.M. testified specifically that McCoy had pushed T.G.M off the bed and disciplined them with a vacuum hose, but she was reluctant to go into any specific details regarding the allegations of sexual abuse during the hearing.

6

¶6.     McCoy testified at the adjudication hearing on his own behalf.  He admitted that he had been taking prescribed narcotic medications for approximately twenty years but adamantly denied abusing his prescriptions.  At the time of the adjudication hearing, McCoy testified that he was prescribed and using Fentanyl transdermal patches, Hydrocodone and Xanax.  He admitted that the outside of his home was somewhat unkempt, but he blamed the disarray on a broken lawnmower, a recent tornado, and lack of finances to remedy the situation.  McCoy denied all allegations of sexual abuse, physical abuse, lack of food in the home, and any other allegations of neglect of M.M., C.M., and T.G.M.  During his cross-examination by the minor children's attorney, McCoy was asked to respond to questions regarding his arrest for possession of a controlled substance on April 30, 2017, six months prior to the adjudication hearing.  McCoy was presented with the allegations in the police report that he was "unconscious behind the steering wheel . . . with [three] juvenile occupants."  However, he denied having ever been unconscious behind the wheel of a vehicle on this occasion or any other occasion.  McCoy admitted that he may have swerved, but that was because T.G.M. was trying to get out of his carseat.  McCoy testified that the possession charges were ultimately dropped because he was able to provide proof of his prescription to the lower court.  According to McCoy, M.M. had lied about serious matters in the past, and he claimed that she was not truthful in her disclosures to MDCPS or in her testimony to the court regarding the abuse and neglect allegations.

¶7.     McCoy's sister Elizabeth Box testified in her brother's behalf at the adjudication hearing.  Box testified that the outside and inside of McCoy's home was "fine" the last time

7

that she visited and that she was not aware of a time that McCoy did not have food in the house for the children to eat. However, Box confirmed that M.M. called her about not having food on the day after Christmas in 2016. Box knew M.M.'s statement was untruthful because Box sent the family home a twenty-pound ham on the day before the call. Box testified that she was aware of other instances where M.M. had "plain out lied" about insignificant things. She was shocked to learn of M.M.'s abuse allegations and skeptical of their veracity. Box was aware that McCoy was taking medications for both his neck and back but was unaware of the specific names and dosages of his medications.

¶8. Finally, McCoy's sister Sharon Watts testified in her brother's behalf at the adjudication hearing. According to Watts, McCoy's home was disheveled "like every third time I would go." Watts testified that while she never saw any rats, she did see roaches on occasion. She attributed the presence of the roaches to a hole in the home's screen door. Watts admitted to taking fast food to the children after M.M. called her asking for food; however, she believed it was probably because the children did not want to eat the food that was in the house. She denied ever seeing McCoy physically discipline the children with any objects such as a belt or vacuum hose and denied having any specific knowledge about McCoy's medications.

¶9. At the conclusion of the adjudication hearing, the court found that M.M., C.M., and T.G.M. were neglected children pursuant to Mississippi Code Annotated section 43-21-105(1). In regard to the abuse allegations, the court stated, "I am not going to say that they are abused at this time because I don't think we are there yet." Further, the court issued a no-

8

contact order concerning visitation with M.M. until the disposition hearing on November 28, 2017. A written adjudication order was entered on December 28, 2017.

## Disposition Hearing

¶10. On November 28, 2017, the youth court conducted a disposition hearing to finalize a plan for custody and visitation for the minor children and adoption of McCoy's service agreement. Veronica Green, the MDCPS supervisor, Tommy McElroy Jr., the minor children's uncle, Watts, and McCoy all testified at the disposition hearing.

¶11. Green testified that it was MDCPS's recommendation that the children remain with their maternal grandfather, McElroy Sr., with the support and assistance of other family members including his son McElroy Jr. Further, MDCPS recommended that all parties should continue to work with McCoy toward reunification with his children as the permanent plan. Green further testified that McCoy should have visitation through phone and in-person visitations. MDCPS also recommended that M.M. and C.M. continue intensive counseling with their therapist, Jacqueline Biggs Eidt, throughout the process. As part of the permanent plan recommended by MDCPS, McCoy was required to sign and fulfill a service agreement. In part, the service agreement required McCoy to correct the deficiencies inside and outside his home to create a livable and safe environment for his children, submit to random drug testing, enroll in individual counseling, and sign a medical consent form so that MDCPS could review his past and current diagnoses and list of prescribed medications.

¶12. The children's attorney, Katie Boone, requested to testify on behalf of guardian ad litem (GAL) Angela James in James's absence. However, upon objection from McCoy's

9

counsel, Boone limited her testimony to her own recommendation for M.M., C.M., and T.G.M. Boone recommended that the youth court bypass a reunification process and that durable physical and legal custody of the minor children be placed directly with McElroy Sr.[4] She proposed that the parties work out an appropriate visitation schedule with McCoy and that McCoy be immediately referred for a family drug court assessment.

¶13. The minor children's uncle, McElroy Jr., testified regarding the status of the current custodial placement for M.M., C.M., and T.G.M. According to McElroy Jr., his father McElroy Sr. and the rest of their family were willing and able to continue with the current custody arrangement for M.M., C.M., and T.G.M., and they would take any steps necessary to ensure the safety and well being of the minor children.

¶14. Similarly, McCoy's sister Watts testified that her daughter, Amanda Hales, was willing and able to take custody of the minor children and wanted to be considered a candidate to take physical custody of M.M. and C.M. Watts testified that her daughter would not be in a position to take care of T.G.M. because of his special needs and that T.G.M. needed to be in a facility that could provide professional help. According to Watts, her daughter was unemployed and drawing disability for a neck and back injury but was not taking any narcotic medications. Amanda Hales did not testify at the hearing.

¶15. Finally, McCoy testified to some of his concerns regarding the current custody arrangement and his understanding of the youth court process moving forward. McCoy

_____

[4] Physical custody of the minor children was transferred from Melton to McElroy Sr. pursuant to an emergency custody order dated November 28, 2017, as a result of Melton's untimely death.

10

testified that he was concerned that T.G.M. was not getting the specialized treatment that he needed and that he was missing doctor's appointments in his current custody placement. McCoy acknowledged that he understood the service agreement proposed by MDCPS and the reasoning for the recommended participation in the youth court family drug court program. Finally, McCoy acknowledged that he intended to sign the MDCPS service agreement and would do whatever it took to re-gain custody of M.M., C.M., and T.G.M.

¶16. At the conclusion of the disposition hearing, the youth court ordered that McCoy enter into a service agreement with MDCPS "ASAP." Secondly, the youth court tasked the children's attorney, Boone, to work with all of the relevant agencies including MDCPS to come up with a specific visitation schedule for McCoy and his children. Finally, the youth court referred McCoy to the family drug court program. Although the court made the ruling from the bench after the testimony, a written disposition order was not entered until December 28, 2017.

**Family Drug Court Hearings and Review Hearings**

¶17. Pursuant to the disposition order entered on December 28, 2017, McCoy enrolled in the family drug court program and attended hearings on December 19, 2017; January 9, 2018; January 23, 2018; February 20, 2018; March 6, 2018; March 20, 2018; April 5, 2018; April 17, 2018; and May 1, 2018. Throughout the family drug court process, the court emphasized the necessity of McCoy's compliance with the rules and recommendations of the drug court program staff. At the very first drug court hearing on December 19, 2017, the court outlined the program rules and McCoy's responsibilities. Further, the court advised

11

McCoy that he should "just be patient. This is not an overnight process, but it can go fast if you just try."

¶18. After reviewing McCoy's intermittent drug test results at the second drug court hearing on January 9, 2018, the court advised McCoy, "[O]ne thing arises that makes me, and I'm not an expert by any means, but your levels have gone considerably higher than they were earlier." Further, the court stated, "I want you to do this. I want you to go see your doctor, your neurological doctor, your bone doctor, whatever, it is, your back doctor. And go find out if there is a surgical procedure that can be done that can relieve you of this pain." Finally, the court re-emphasized the importance that McCoy follow the recommendations of the court by saying, "[J]ust do what I have told you and to get through this program, okay? It's going to take awhile. Like I said 305 [days], it's almost, it's nine months."

¶19. At the drug court hearing on January 23, 2018, McCoy did not give any testimony that he had followed through with the court's previous recommendation to discuss the possibility of surgery with his doctor to potentially eliminate his medications. McCoy advised the court that he had "cut down" on his usage of the Fentanyl patches from every two days to every three days. However, when the court asked him how long a patch was supposed to last, McCoy stated that it should last three days, but he had been using one every two days. At this hearing, the court also recommended for the first time that McCoy receive an assessment from a professional drug treatment facility. The court stated:

> We believe you are taking too much of the medicine. That is the reason these issues have come up. You've told us, you've said it, if I could get off these medicines I would. . . . It's not going to cost you anything. Insurance will cover all this. You don't have a job; your kids aren't home right now, and this

12

is the perfect time to go get this assessment, okay? So that's the recommendation of the Drug Court team. It will be up to you whether you wish to accept that or not.

The court advised McCoy that the drug court staff would set up the initial assessment with Alliance Health Center in Meridian, Mississippi. Upon McCoy's request, the court provided him with additional information on Alliance and said, "I wouldn't call them[;] just check it out. Read."

¶20. McCoy came to the drug court hearing on February 20, 2018, represented by new counsel. During this hearing the court followed up with McCoy to see if his doctors had yet determined if surgery was a viable option to relieve his pain. McCoy responded that the doctors wanted to do surgery again; however, he really did not want to go through with it. He further testified that he did not believe that going to a treatment center to eliminate his pain medication was feasible. The court asked McCoy, "[W]hat if, this court is telling you, if you don't go to treatment and try to scale back on some of those opiates you are taking, then you're not going to get your kids back. That's what we're looking at." McCoy responded that he did not know how he could do that. The court advised McCoy's attorney:

> He's not going to get his children back if he doesn't try something else. . . . The doctors have told him he can have surgery. He refuses to have the surgery. . . . We've told him he can go to Alliance Healthcare, and they will work with him to try to at least scale back the use [he is] taking right now.

¶21. Boone advised the court that McCoy immediately called Alliance Healthcare after leaving the last drug court hearing in an effort to give the facility his version of the situation and went on to tell them that he did not need treatment. Boone further stated that within forty-five minutes of talking to Alliance, McCoy contacted her and said that "he didn't need

13

[treatment] because people there said he didn't need it." Boone claimed that McCoy may have sabotaged the whole plan to receive an assessment for future treatment by Alliance.

¶22. At the drug court hearing on March 6, 2018, the court yet again addressed McCoy's non-compliance with the recommendation to seek an assessment with Alliance. After the February 20 drug court hearing, an Alliance employee came to one of McCoy's drug testing appointments for the drug court. At that appointment, McCoy refused to be evaluated by Alliance without his attorney present. Both McCoy and a member of the family drug court staff advised the youth court that the Alliance employee told McCoy that they could not do an evaluation with an attorney present. The court advised McCoy no less than six times during this hearing that the drug court staff's recommendation was that he receive treatment for his addiction. At one point the court stated:

> [I]t's still the Family Dug Court's recommendation and let me say this, it's pretty unanimous that you need to go to treatment to get the opiate issues under control at least reduced, okay? When that happens you got an excellent chance of getting your children back. If it doesn't happen, you got an excellent chance of losing your children. It's as simple as that. . . . [T]he medication you are on right now is the stuff they put on for people short term basis for severe pain and people who are dying of cancer and you're not any of those.

During this hearing, the court ordered that McCoy go to treatment in an effort to get his kids back. The court re-emphasized the importance of McCoy's compliance with the court's recommendation and order by stating:

> I'm just letting you know that's what the order of the court is. You can abide by it or you don't have to. It's up to you. All this stuff is voluntary Mr. McCoy. You don't have to do any of this stuff. There is just going to be repercussions. We look after the safety of your children. This is a rerun of what we have talked about every time since you have come in here.

14

The court followed up its recommendation with an order entered on March 20, 2018, which stated in relevant part:

> It is ordered by the court for Thomas McCoy to go to treatment to have an evaluation of his medicine to see if he can take less narcotic drugs or change to non-narcotic. His case manager and Mr. McCoy will set up an appointment by phone for Alliance Health. He continues to refuse treatment. He has been warned that failure to abide by this order of treatment may cause him to lose custody of his children permanently.

¶23. At the drug court hearing on March 20, 2018, McCoy indicated that he was going to have surgery on his hand and potentially his knee and back. He told the court that because of his upcoming surgeries that it would be counterproductive to enter a drug treatment facility at the current time. The court advised McCoy to keep the court apprised of his surgeries.

¶24. At the outset of the drug court hearing on April 5, 2018, the court acknowledged that McCoy had not yet had his hand surgery that was discussed at the prior drug court hearing. The majority of the hearing consisted of the family drug court staff members expressing their frustration with McCoy's non-compliance with their recommendations. The youth court stated:

> [McCoy] interrupts people and doesn't let them try to help him. You know the plan was still reunification. They still want to reunify these children with him, but it's getting harder and harder to do that because of his behavior, and because of his insistence not to go to treatment, and I can't make him have the back surgery. . . . [W]e could be working on our reunification right now, but he's refused to go, so I don't know what else to do about him.

The drug court staff emphasized that their position had always been that McCoy cannot properly care for his children when he is on the amount of medication that he regularly takes.

Further, the MDCPS case worker advised the court that McCoy's visitations were in jeopardy of being discontinued as a result of him continuously bringing up what has happened in the past with the children rather than focusing on quality visitation. As a result of reports from the drug court staff and MDCPS, that there had been little to no progress with McCoy in furtherance of reunification, the parties agreed to set a review hearing for McCoy's case on April 11, 2018.

¶25. At the April 11, 2018 review hearing MDCPS case worker Kadeshia Hunt was the first witness to testify. She testified that MDCPS had been working with McCoy since June 2017 toward reunification with his children. However, McCoy had not been compliant with the recommendations of the family drug court, and the quality of his visitations with the children was deteriorating. According to Hunt:

> [T]he agency has been working with Mr. McCoy since June of 2017, and we've kind of, we've done pretty much, we've [exhausted] all efforts as far as services that we can render to Mr. McCoy to be reunified. We are asking that, at this particular time, because the kids are doing well in their current placement, that we ask that the plan of reunification be changed to durable legal custody. That Mr. McCoy continue to cooperate and work with Family Drug Court, and that the children still continue their counseling sessions with Ms. Jackie Eidt.

Finally, Hunt testified that "[w]e can't continue to linger on another year to give Mr. McCoy that time. The kids need stability. . . . [T]hat is just where we are at this particular point."

¶26. Katie Boone, the attorney for the children, also testified at the review hearing on behalf of the children. Boone adopted Hunt's recommendation regarding the custody of the minor children. In regard to McCoy's cooperation with the court's recommendation for treatment, Boone stated, "[S]o all we can do is try to get him to professionals to have

16

independent assessments, and he has fought us every step of the way on that."

¶27. The children's therapist, Eidt, testified at the review hearing regarding her personal interactions with the children throughout the lengthy youth court process. Eidt testified that she was first introduced to McCoy's children after receiving a referral from M.M.'s school guidance counselor around April or May of 2017. According to Eidt, before being placed with her grandfather, McElroy Sr., M.M. would

> take hamburgers home from the cafeteria. She would ask some of the other kids if they were going to eat their food, and she would take [that food] home on the weekends so that her brother and sister would have something to eat because they weren't being fed. . . . [T]hey simply didn't have food. . . . She said we ate cold food out of cans.

Eidt further testified that M.M. disclosed to her:

> [T]hey didn't have running water in the sink, and there were so many dirty dishes in the bathtub, that they weren't able to use the bathtub for baths. And, in fact, [M.M.] testified on numerous occasions that she was told that taking a bath was a privilege. And so I asked her about removing the items from the bathtub, and she said there were maggots in the bathtub from the food particles.

According to Eidt, since the children had been removed from McCoy's home, the children have "gained weight; they have grown out of their clothes. They're clean, the[y're] happier, they know they are being cared for in a way that I suspect they were not being care[d] for when they were with their dad."

¶28. Eidt also testified about her interactions and conversations with McCoy. According to Eidt, "[McCoy] has been in my presence on a few occasions and been so stoned he was barely able to hold his head up. . . . I was worried about his capacity to even drive." In her conversations with McCoy, Eidt stated that he would never acknowledge any wrongdoings

17

on his part and constantly blamed M.M. for putting the family in the current situation. She testified that McCoy told her that "if [M.M.] had cleaned up like I asked her to we wouldn't be in this position." Eidt further testified that McCoy's unwillingness to change would make the likelihood for improvement, progress, and a safe environment very limited. In Eidt's opinion, the children would not be safe if they were returned to their father's custody and that they would not be properly cared for.

¶29. Dr. Arnold Feldman was McCoy's pain management doctor for approximately ten years. Although Dr. Feldman did not participate in the hearing, McCoy produced a letter from Dr. Feldman that indicated his prescription for Fentanyl was both reasonable and necessary and should not prejudice McCoy's rights or otherwise negatively influence the decision of the court. Notably, the court discovered that Feldman's license was previously revoked in both Louisiana and Mississippi.

¶30. Doctor Ronald Vincent Meyers Sr. testified in McCoy's behalf after having consulted with Feldman regarding McCoy's condition and treatment. Dr. Meyers testified it was his opinion that

> [McCoy] is on a proper medication for a chronic pain patient who has heart conditions that is not a surgical candidate. For him to be able to function appropriately and have a means of taking care of himself and living a decent life he needs the medicines as prescribed by his doctor. I agree to the treatment and that he should continue with the medication as prescribed for his chronic back pain in light of his cardiac condition, his pacemaker and other complicating situations, medically.

As a result of several follow up questions from the court and the GAL, Dr. Meyers admitted that he had previously surrendered his medical license in Oklahoma and was not licensed to

18

practice in any other state. Further questioning revealed that Dr. Meyers was arrested and indicted in Oklahoma for overprescribing narcotics; however, the charges were dropped as a result of his surrendering his license.

¶31. The court continued the remainder of the review hearing until the next scheduled drug-court hearing date on April 17, 2018. When the parties arrived in court on April 17, McCoy's counsel was not present. The court allowed the children's maternal grandfather and present legal custodian, McElroy Sr., to testify along with his son, McElroy Jr., subject to potentially having to come back at another time so that McCoy's counsel could cross-examine them. Despite his attorney not appearing at the hearing, McCoy was present at this hearing.

¶32. McElroy Sr. testified that all of the children were thriving in his care. After being placed in his custody, T.G.M. was afforded a spot at Millcreek, which is an inpatient facility for special-needs children. According to McElroy Sr., since his placement at Millcreek, T.G.M.'s medications have been adjusted so that he functions at the highest level possible, and the improvement in his behavior and his ability to perform certain tasks outside the home was "amazing." McElroy Sr. testified that C.M.'s grades are getting better as well as her attitude. According to McElroy Sr., M.M.'s grades were also improving, and she was "finally being able to be a little girl and not have to be a mama; not have to worry about giving medicine, not having to worry about when they are going to be standing on the side of the road, not having to worry about food." McElroy Sr. advised the court that he was willing and able to provide M.M., C.M., and T.G.M. a primary residence and stable home.

19

¶33.    Finally, McElroy Jr. testified at the hearing that he was more than willing and able to help his father in any way that he could to take care of M.M., C.M., and T.G.M.  He advised the court that he would do whatever the court might require of him to assist in the process. After his testimony, the hearing was concluded until the next scheduled drug court hearing, and both McElroy Sr. and McElroy Jr. were advised that they may have to come back for cross-examination by McCoy's attorney.

¶34.    At the final drug court hearing on May 1, 2018, McCoy was still testing positive for opiates.  During the hearing, the court indicated that Dr. Feldman, McCoy's former pain management doctor, had reached out to the court since the last court date to discuss the possibility of eliminating some of McCoy's pain medication.  While this update was promising, new issues regarding McCoy's visitations with C.M. and T.G.M. were causing more concern.  The children's therapist and visitation supervisor, Eidt, reported to the court that McCoy had been passing notes to C.M. during visitation, which said things like "[D]o you want to come home with me[?]"  McCoy had previously been advised that these types of communications with the children were not appropriate.  As a result of the notes, all colors and coloring books had to be removed from the visitation space.  Further, Eidt reported that McCoy was "stoned on medication," "can't keep [his] head up," and was "slurring his words" during visitations with the children.

¶35.    At the conclusion of the final drug court hearing, the court entered a written order on June 18, 2018, which stated in part, "It is ordered by the court that durable legal custody of Mr. McCoy's children be achieved with relatives, the children's grandfather, Tommy

20

McElroy Sr. This should be finalized at the next permanency hearing. Mr. McCoy is discharged from Family Drug Court. This case is closed." Pursuant to the drug court order, a final permanency hearing was scheduled for June 25, 2018.

¶36. At the next permanency hearing on June 25, 2018, the MDCPS case worker, Hunt, and court appointed special advocate (CASA) worker, James, both testified as to their recommendation for the permanent custodial placement of M.M., C.M., and T.G.M. Hunt and James both recommended that the permanent plan for the children be changed to durable legal custody with a family member, and the youth-court case closed due to McCoy's non-compliance with the service agreement and with the family drug court program staff's recommendations. Both Hunt and James agreed that an evolving visitation with McCoy and his two younger children be incorporated into the permanent plan. More specifically, the recommendation to the court was that McCoy's sister Box be an active participant in McCoy's visitation with the two younger children so that "hopefully they can deal with this thing as a family rather than the court intervention." According to Hunt,

> We have to ensure the safety and well being of the children. And we have not been able to determine whether or not Mr. McCoy is able to take care of his kids based on the medication he is taking. It is in their best interest that they be in a stable environment. This case has been going on for quite some time now, and permanency is needed for these kids.

¶37. As a result of the hearing on June 25, 2018, the court entered three separate permanency orders for M.M., C.M., and T.G.M. on July 23, 2018. The permanency order for C.M. stated in part

> [T]he permanent plan of Durable Legal Custody of [C.M.], has been achieved with her grandfather, Tommy McElroy, Sr.. The child will continue therapy

21

sessions with Ms. Jackie Eidt. Visitation between [C.M.] and her father, Thomas McCoy, shall be supervised by Ms. Eidt. **This case is closed**.

(Emphasis added). The permanency order for T.G.M. stated in part

> [T]he permanent plan of Durable Legal Custody of [T.G.M.], has been achieved with [his] grandfather, Tommy McElroy, Sr.. The child receives residential treatment at Millcreek. Visitation with the father will be scheduled by the treatment facility at the appropriate time. **This case is closed**.

(Emphasis added). The amended permanency order for M.M. stated in part

> [T]he permanent plan of Durable Legal Custody of [M.M.] has been achieved with her grandfather, Tommy McElroy, Sr. The child will continue therapy sessions with Ms. Jackie Eidt. Visitation between [M.M.] and her father, Thomas McCoy, shall not occur until such time as the child's therapist, Ms. Eidt, makes a recommendation for visitation to occur. **This case is closed**.

(Emphasis added).

### Appeal and Post-Trial Motion

¶38. On August 13, 2018, McCoy filed a single notice of appeal of the original adjudication order dated December 28, 2017, and the permanency orders and amended permanency order dated July 23, 2018. Shortly thereafter, McCoy was notified by the clerk's office that his appeal would require three separate notices, one for each minor child. On October 31, 2018, McCoy filed a "motion to accept notice of an appeal filed out of time" as well as three separate notices of appeal pursuant to the clerk's instruction.

¶39. On May 15, 2019, the youth court entered an order allowing the appeal of the permanency orders and amended permanency order dated July 23, 2018, but not the original adjudication order dated December 28, 2017. On March 24, 2018, McCoy filed an additional notice of appeal of the youth court's order dated May 15, 2019, which denied his request for

22

an out-of-time appeal of the adjudication order.

## STANDARD OF REVIEW

¶40.    "'The appellate standard of review for youth court proceedings is the same as that which we apply to appeals from chancery court. . . .'" *E.K. v. Miss. Dep't of Child Prot. Servs.*, 249 So. 3d 377, 381 (¶16) (Miss. 2018) (quoting *In re J.P.*, 151 So. 3d 204, 208 (Miss. 2014)).  "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003).  Further, "this Court will not disturb the findings of a chancellor 'unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard.'" *Id*. (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000)).

## ANALYSIS

¶41.    McCoy asserts eight issues on appeal stemming from both an adjudication order entered on December 28, 2017, and permanency orders and the amended permanency order dated July 23, 2018.  Those issues include: (1) whether a reasonable person could find by a preponderance of evidence that M.M., C.M., and T.G.M. were neglected children pursuant to Mississippi Code Annotated section 43-21-105(1); (2) whether the youth court erred in bypassing the reunification process of McCoy with his minor children; (3) whether the youth court erred in "disregarding the Mississippi Rules of Evidence throughout the adjudication proceeding"; (4) whether the youth court erred in "failing to consider all of the evidence the Appellant put forth"; (5) whether the GAL for the children abdicated her position, and thus her responsibility to act in the best interest of the children, by assuming the role of the CASA

23

worker; (6) whether McCoy's due process rights were violated by virtue of the youth court's finding that he had failed to comply with the service plan developed by MDCPS; (7) whether the youth court erred in finding that reunification of McCoy and his minor children was not in the children's best interest but rather to be durable legal custody with McElroy Sr., the children's maternal grandfather; and (8) whether McCoy was entitled to reopen the time for appeal of the adjudication order pursuant to Mississippi Rule of Civil Procedure 4(h). McCoy's last issue on appeal regarding the timeliness of his appeal of the adjudication order dated December 28, 2017, is the threshold issue and therefore will be addressed first.

### I. Whether McCoy's appeal of the December 28, 2017 adjudication order was timely.

¶42. Although McCoy acknowledges that his notice of appeal of the adjudication order dated December 28, 2017, was filed outside of the permissible time-frame pursuant to Mississippi Rule of Appellate Procedure 4(a), he argues on appeal that he is entitled to have the time for appeal reopened for that order. More specifically, McCoy argues that as a result of not receiving a copy of the adjudication order, he is entitled to have the time for appeal reopened pursuant to Mississippi Rule of Appellate Procedure 4(h). Further, he argues that he was never told by his attorney or the youth court that he could appeal the adjudication order as required by Mississippi Code Annotated section 43-21-557(1)(e)(v)(Rev. 2015). McCoy argues that the youth court's non-compliance with Mississippi Code Annotated section 43-21-557(1)(e)(v) is reversible error.

### A. Mississippi Rule of Appellate Procedure Rule 4

¶43. Mississippi Rule of Appellate Procedure Rule 4(a) provides in part that

an appeal or cross-appeal is permitted by law as of right from a trial court to the Supreme Court, the notice of appeal required by Rule 3 shall be filed with the clerk of the trial court **within 30 days after the date of entry of the judgment or order appealed from**.

(Emphasis added). However, Mississippi Rule of Appellate Procedure Rule 4(h) provides an avenue for the time for appeal to be reopened in certain circumstances. Rule 4(h) states in part that

[t]he trial court, if it finds (a) that a party entitled to notice of the entry of a judgment or order did not receive such notice from the clerk or any party within 21 days of its entry and (b) that no party would be prejudiced, may, **upon motion filed within 180 days of entry of the judgment or order or within 7 days of receipt of such notice, whichever is earlier**, reopen the time for appeal for a period of 14 days from the date of entry of the order reopening the time for appeal.

(Emphasis added).

¶44. In *Tandy Electronics Inc. v. Fletcher*, 554 So. 2d 308 (Miss. 1989), the Mississippi Supreme Court emphasized the importance of strict compliance with the timeliness of notice of appeals as set forth in Mississippi Rule of Appellate Procedure Rule 4(a). In *Tandy*, the supreme court stated:

[w]e have adopted a procedure that is simple, . . . and allowed thirty days to complete the procedure. The thirty day limit is surely one with which anyone can comply. We cannot imagine it taking more than fifteen minutes of an attorney's time to perform the preparation and mailing of a notice of appeal. . . . **The interests of certainty and avoiding official arbitrariness in decision-making suggest a hard-edged inflexible cutoff to end the reasonable time frame, as opposed to a loose or flexible standard.**

*Id*. at 310 (emphasis added). In *Tandy*, the supreme court concluded its opinion by stating, "[t]he bottom line is a point made by Justice Hawkins, speaking for the Court. 'A rule which is not enforced is no rule.'" *Id*. at 312 (quoting *Box v. State*, 437 So. 2d 19, 21 (Miss. 1983)).

25

¶45. The Mississippi Supreme Court has consistently stood unwavering to the principal that Rule 4 should be strictly upheld. In *Pruett v. Malone*, 767 So. 2d 983, 985 (¶11) (Miss. 2000), the supreme court stated "Rule 4(a) is a 'hard-edged, mandatory' rule which this Court 'strictly enforces.' . . . The rules of this Court are designed to give finality to a judgment at a point which it has defined as 30 days after a final, appealable order or judgment."

¶46. Likewise, this Court has consistently upheld strict compliance with Mississippi Rule of Appellate Procedure 4(a). In *Redmond v. Mississippi Department of Corrections*, 910 So. 2d 1211, 1212 (¶4) (Miss. Ct. App. 2005), this Court stated

> The time limits for perfecting an appeal are strictly enforced, and filing the notice even one day late requires dismissal of the action. . . . Although the trial court has authority, under Rule 4(g) of the Rules of Appellate Procedure, to extend the time for filing a notice of appeal under certain circumstances, we do not.

More similar to McCoy's case, this Court addressed the reopening of the time to appeal pursuant to Mississippi Rule of Appellate Procedure 4(h) in *Bailey v. Chamblee*, 192 So. 3d 1078, 1082 (¶12) (Miss. Ct. App. 2016). In that case, Bailey did not file her notice of appeal within the strictly enforced thirty-day deadline required by Mississippi Rule of Appellate Procedure 4(a). But like McCoy in the present case, Bailey sought an expansion of time pursuant to Mississippi Rule of Appellate Procedure 4(h) because she claimed that the circuit clerk failed to provide her with notice of the final order. *Id*. In *Bailey* this Court held that "Rule 4(h) provided no authority to reopen the time for appeal . . . because Bailey's motion was not 'filed within 180 days of entry of the judgment or order.' It was filed approximately 473 days after the order was entered." *Id*.

¶47. In the present case, the adjudication order which McCoy sought to appeal was entered on December 28, 2017.[5] McCoy did not file his notice of appeal until August 13, 2018, which was 229 days after the entry of the adjudication order. Further, McCoy did not file his motion to accept notice of an appeal filed out of time[6] until October 31, 2018, 307 days after the entry of the adjudication order. Not only was McCoy's notice of appeal filed grossly outside of the thirty-day window pursuant to Rule 4(a), it was filed well outside the 180-day window pursuant to Rule 4(h). Through its rules our court system is designed to bring efficiency and order to disputes and provide notice of the action being taken. The rules of court and the technical requirements are indispensable to the timely and orderly functioning of the judicial system. The requirements for the timely filing of a notice of appeal or motion for enlargement of time are two such indispensable rules. Compliance with the rules breathes jurisdictional life into the appellate process for the resolution of dispute. Non-compliance works the opposite and subjects the matter in dispute to finality. Mississippi Rule of Appellate Procedure 2(a) provides for the dismissal of an appeal as a result of an untimely notice of appeal. *Hodnett v. Anderson*, 913 So. 2d 994, 997 (¶9) (Miss. Ct. App. 2005). "Our supreme court has made clear that 'Rule 2(a) reflects the long-standing [principle] in

---

[5] An adjudication order becomes an appealable judgment only after a disposition order is entered by the youth court. *In re J.P.C. v. State*, 783 So. 2d 778, 781 (¶9) (Miss. Ct. App. 2000). In the case sub judice, the adjudication order and the disposition order were both entered on December 28, 2017, and the adjudication order became appealable on that date.

[6] While McCoy's motion was entitled "motion to accept notice of an appeal filed out of time," rather than conforming to the language of Mississippi Rule of Appellate Procedure Rule 4(h), "motion to reopen time for appeal," his motion sought the same relief.

this state that the failure to file a timely appeal leaves [the appellate court] without jurisdiction to consider the case.'" *Id*. (quoting *Bank of Edwards v. Cassity Auto Sales Inc.*, 599 So. 2d 579, 582 (Miss. 1992)). In McCoy's case, he failed to comply with not one but two rules as set forth in Mississippi Rules of Appellate Procedure 4(a) and 4(h). The time to appeal the order he seeks now to appeal long-since expired, and the youth court did not abuse it discretion in denying the Motion for time to file an out-of-time appeal. To hold otherwise would allow uncertainty and prevent finality in our system of justice, which would prevent the very justice the system seeks to promote. Therefore, this argument is without merit.

### B. Mississippi Code Annotated section 43-21-557(1)(e)(v)

¶48. Mississippi Code Annotated section 43-21-557 sets out parameters as to how a youth court hearing should be conducted. More specifically, Mississippi Code Annotated section 43-21-557(1)(e)(v) states that "[a]t the beginning of each adjudicatory hearing, the youth court shall . . . explain to the parties . . . the right to appeal." On appeal, McCoy argues that the Adams County Youth Court never explained to him his "right to appeal." He argues that due to that statutory failure, the youth court's judgment should be reversed. However, this Court has held that the "failure to comply with Section 43-21-557 does not necessarily result in automatic reversal." *In re L.C.A.*, 938 So. 2d 300, 306 (¶19) (Miss. Ct. App. 2006). In *In re L.C.A.*, this Court noted that L.C.A. was represented by counsel at all of the youth court hearings and counsel did not make any objection or complain about the youth court judge's failure to explain section 43-21-577 to his client. *Id*. Further, L.C.A.'s counsel proceeded

to cross-examine witnesses and call witnesses on L.C.A.'s behalf. This Court held that the youth court's failure to explain Mississippi Code Annotated section 43-21-577 was harmless error at best. In *In re T.L.C.*, 566 So. 2d 691, 699 (Miss. 1990), *overruled on other grounds by In re J.T.*, 188 So. 3d 1192, 1201-02 (¶¶49, 51) (Miss. 2016), the biological father was "ably represented by counsel during both the adjudicatory and disposition hearings" and his counsel "vigorously cross-examined the witnesses called by the youth court prosecutor and gave closing argument." The supreme court held that "[w]hile conscientious practice counsels that the youth court follow the procedure concerning notification of parties' rights, in this case Roy Cortesi can point to no denial of any right that would make the hearings any less than fair. The error, if any, is harmless." *Id*.

¶49. In the case sub judice, McCoy was represented by counsel at both the adjudication hearing and the disposition hearing. At no point during either of those two hearings did McCoy's counsel object or make any complaint about the youth court's failure to comply with Mississippi Code Annotated section 43-21-577. McCoy's counsel proceeded to zealously represent him throughout the hearings by cross-examining witnesses and calling witnesses to testify in his behalf. As such, the error, if any, is harmless and the issue without merit.

## II. Whether the youth court erred in bypassing the reunification process of McCoy with his minor children.

¶50. McCoy claims on appeal that the youth court erred in bypassing reunification with his children because MDCPS did not employ reasonable efforts to facilitate reunification of the family. McCoy claims that he "was continuously trying to comply with the court's goal for

him to reduce and/or refrain from using narcotic drugs" in an effort to "cooperate with the youth court requirement that he enter an inpatient treatment facility. . . ." Finally, he claims that "CPS and CASA never wanted to work with reunification of [McCoy] with his children. . . ."

¶51. McCoy does not state with any specificity as to how the youth court allegedly bypassed the reunification process or how MDCPS did not employ reasonable efforts to facilitate reunification. In fact, Hunt testified that MDCPS had been working with McCoy since June 2017 toward reunification with his children. Further, Boone testified that "a whole lot of people" made efforts to work with McCoy from the date that the children were removed from his home until the initial intake order was entered to informally assist him in reunifying the family outside of court proceedings or court orders. McCoy had court ordered visitation rights that afforded him supervised visits with the children. Even after a deterioration in the supervised visitations caused by McCoy's being "stoned"[7] during visits and having inappropriate conversations with the children, the children's therapist continued to facilitate the visitations in an effort towards reunification. Despite McCoy's non-compliance throughout the youth court and family drug court process, it was not until the review hearing on April 11, 2018, that MDCPS changed its recommendation of reunification to durable legal custody with McElroy Sr. The recommendation change stemmed from McCoy's non-compliance with the recommendation of the family drug court staff. Simply put, McCoy refused to enter a drug treatment facility as recommended and ordered by the

---

[7] According to the testimony of the children's therapist, Eidt, McCoy was described as being "stoned" at some of his supervised visitations.

family drug court. It is also important to note that the disposition order dated December 28, 2017, adopted a "permanency plan of reunification with a parent or primary caretaker" and this permanency plan never changed until the permanency orders and amended permanency order dated July 23, 2018. Absent any specific proof that the court bypassed the reunification process, and in light of the testimony by MDCPS, and the prior orders of the court adopting a reunification plan, McCoy's claim is without merit.

### III. Whether McCoy's due process rights were violated by virtue of the youth court's finding that he had failed to comply with the service plan developed by MDCPS.

¶52. McCoy asserts that MDCPS was never clear in communicating his responsibilities necessary to stay in compliance with the service plan. He further argues that the family drug court's recommendations and orders were ambiguous as to his responsibility in receiving drug treatment. McCoy continues to maintain that he "cooperated with MDCPS in doing **almost everything** that was requested of him by CPS and the youth court." (Emphasis added). He argues that there was insufficient evidence to show that he was not in compliance with the MDCPS service plan.

¶53. Notably McCoy was represented by three different attorneys to guide him through each stage of the youth court process and the family drug court process. The transcripts from the youth court hearings and the family drug court hearings are full of specific directives from the entire court staff and MDCPS as to exactly what was expected of McCoy in furtherance of his service plan and the recommendations of the family drug court.

¶54. The youth court painstakingly went through each one of the numbered tasks in

31

MDCPS's proposed service plan with McCoy and his counsel present in an effort to make sure that he understood his obligations under the service plan. Specifically, the transcript reflects the following:

> THE COURT: No. 2. Mr. McCoy will cooperate with all agencies that are involved with his family with the safe return of his children to his home. The Plan is reunification. . . . Will he agree to part 2 there?"
>
> MR. SHAREEF: Yes, sir.

One of the agencies involved with McCoy's family and the safe return of his children was the family drug court program. The youth court's disposition order dated December 28, 2017, stated in part that "Mr. McCoy will enroll in Family Drug Court Program for services." Although McCoy did attend each of the family drug court hearings and complied with drug testing, he did not follow through with the recommendations of the drug court staff. The drug court made its first recommendation that McCoy needed a drug treatment assessment on January 23, 2018. At the February 20, 2018 drug court hearing, McCoy had not yet received a drug assessment and advised the court that he did not feel like he needed treatment. At the March 6, 2018 drug court hearing, McCoy still had not yet received a drug assessment, and the drug court responded, "[I]t's still the Family Drug Court's recommendation and let me say this, it's pretty unanimous that you need to go to treatment to get the opiate issue under control at least reduced, okay?" The drug court followed up its recommendation with an order dated March 20, 2018, which stated in part that "[i]t is ordered by the court for Mr. McCoy to go to treatment to have an evaluation of his medicine to see if he can take less narcotic drugs or change to non-narcotic." The drug court staff

continued to recommend and discuss the importance of treatment at every subsequent hearing, while McCoy continued to make excuses as to why he could not comply with the recommendation. The drug court advised McCoy, "I can't make it any simpler, Mr. McCoy. You need this treatment. You need to get it. It will save your life. **It will get your kids back.**" (Emphasis added). At the last review hearing on June 25, 2018, over five months after the initial recommendation for drug treatment, McCoy had still not complied with the recommendation to seek treatment for his opioid use. Both youth court and drug court could not have made their expectations for McCoy's success with the service plan any more clear. McCoy's non-compliance with the drug court's recommendation and order to receive drug treatment violated his service agreement, wherein he agreed to "cooperate with all agencies that are involved with his family with the safe return of his children to his home." By McCoy's own admission in his brief, he stated that he "cooperated with CPS in doing **almost everything** that was requested of him . . . ." (Emphasis added). This admission alone is indicative of his non-compliance with the entirety of his service plan. The record does not support McCoy's argument that he was ever unaware of his obligations and the expectations pursuant to the MDCPS service plan, and therefore this issue is without merit.

> **IV. Whether the youth court erred in finding that reunification of McCoy and his minor children was not in the children's best interest but rather as durable legal custody with McElroy Sr., the children's maternal grandfather.**

¶55. McCoy asserts that the youth court erred in changing the permanency plan for the minor children from reunification with McCoy to durable legal custody with McElroy Sr. McCoy further argues that the court should have considered the factors set forth in *Albright*

*v. Albright*, 437 So. 2d 1003 (Miss. 1983), in making its determination on what was in the best interest of the children. Finally, he argues that the youth court erred by not considering any of McCoy's relatives as potential candidates for durable legal custody.

¶56. Durable legal custody in neglect and abuse cases is governed by Mississippi Code Annotated section 43-21-609(b) (Supp. 2017). Pursuant to the statute, a disposition order may

> [p]lace the child in the custody of his parents, a **relative** or other person subject to any conditions and limitations as the court may prescribe. If the court finds that temporary relative placement, adoption or foster care placement is inappropriate, unavailable or otherwise not in the best interest of the child, durable legal custody may be granted by the court to any person subject to any limitations and conditions the court may prescribe; such **durable legal custody will not take effect unless the child or children have been in the physical custody of the proposed durable custodians for at least six (6) months under the supervision of the Department of Human Services.** The requirements of Section 43-21-613 as to disposition review hearings do not apply to those matters in which the court has granted durable legal custody. In such cases, the Department of Human Services shall be released from any oversight or monitoring responsibilities.

*Id*. (emphasis added). As stated above, the prospective relative custodian must have exercised physical custody of the child for at least six months. McElroy Sr. is the only relative who met that qualification. McCoy's argument concerning the consideration of an alternate guardian would have been appropriate at the initial adjudication hearing and the disposition hearing. As a result of McCoy's not filing the notice of appeal within the prescribed period, this Court lacks jurisdiction over an appeal from the adjudication order. Therefore, the issue of alternate guardians asserted by McCoy will not be addressed any further.

34

¶57. While McCoy argues that the court should have considered the *Albright* factors in its custody determination, those factors are not appropriate in the case sub judice. "In custody battles between a natural parent and a third party, it is presumed that it is in the child's best interest to remain with his or her natural parent." *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012). However, "[t]he natural-parent presumption can be rebutted by a clear showing that . . . the parent is unfit, mentally or otherwise to have custody." For reasons previously discussed, the youth court adjudicated M.M., C.M., and T.G.M to be neglected children as defined by Mississippi Code Annotated section 43-21-105(1). More specifically, the youth court found that McCoy was unfit and unable to care for his children as a result of his addiction to opiates. His failure to comply with the recommendations of the drug court to remedy the problem resulted in a recommendation change for durable custody to be placed with the children's grandfather, McElroy Sr. Further, the record reflects that McElroy Sr. testified that he was ready, willing, and able to care for the minor children and all of their needs, including the special needs of T.G.M. Both Hunt with the MDCPS and James, the minor children's GAL, testified that based on their observations, it was in children's best interest that durable legal custody be placed with the minor children's grandfather, McElroy Sr. Therefore, this issue is without merit.

¶58. All of the remaining issues in McCoy's brief stem from the adjudication order dated December 28, 2017. Due to the fact that this Court does not have jurisdiction over an appeal of the adjudication order as a result of McCoy's failure to file an appeal from that order within the prescribed time, no further issues appealed are properly before this Court.

## CONCLUSION

¶59. After review of the record, we find no error in the youth court's decision to disallow McCoy's appeal of the adjudication order dated December 28, 2017. Further, we find no error in the youth court's decision to amend the permanency plan for M.M., C.M., and T.G.M. from reunification with their father to durable legal custody with McElroy Sr., their maternal grandfather. Therefore, the orders of the youth court are affirmed.

¶60. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McCARTY AND SMITH, JJ., CONCUR. McDONALD AND EMFINGER, JJ., NOT PARTICIPATING.**