# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00402-COA

**KELLY BERTHA BINGHAM**                                    **APPELLANT**

**v.**

**KENNETH JOHNSON**                                              **APPELLEE**

DATE OF JUDGMENT:          11/01/2018
TRIAL JUDGE:               HON. EDWARD E. PATTEN JR.
COURT FROM WHICH APPEALED: LINCOLN COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:    JEFFERY KENDRICK HARNESS
ATTORNEY FOR APPELLEE:     JOSEPH A. FERNALD JR.
NATURE OF THE CASE:        CIVIL - CUSTODY
DISPOSITION:               AFFIRMED - 06/15/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Kelly Bingham appeals from the Lincoln County Chancery Court's judgment of divorce awarding her ex-husband Kenneth (Ken) Johnson full physical and legal custody of their daughter, K.J.[1]  Kelly's sole argument on appeal is that the chancellor abused his discretion in his *Albright*[2] analysis, which served as the basis for his custody award.  After review, we find substantial evidence in the record to support the chancellor's decision to award Ken custody of K.J.  Accordingly, we affirm.

## FACTS

---

[1] Initials are used to protect the identity of the minor child.

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

¶2.     Ken and Kelly married on November 1, 2014. They had one child together, K.J., born in 2015. The couple separated on September 18, 2017, and Ken filed for divorce on November 8, 2017.

¶3.     On December 20, 2017, the parties entered into an agreed temporary order, which gave Kelly temporary custody of K.J. The order also allowed Ken visitation every other weekend and required him to pay $352 per month in child support. Further, the agreed temporary order specified, among other things, that neither party was to leave K.J. with anyone not related by blood or marriage, expose her to any immoral or illegal activity, or take her out of state without at least twenty-four hours' notice.

¶4.     On January 11, 2018, Kelly filed her answer, defenses to the complaint for divorce, and a motion for temporary relief and counter-complaint. Ken filed an answer to Kelly's counterclaim. On the day of trial, May 3, 2018, the parties consented to a divorce on the ground of irreconcilable differences. The parties reached an agreement as to the division of property but proceeded to trial on the issues of child custody and child support.

¶5.     At trial, Kelly testified that she had one older daughter from a previous relationship and that the child's father was in prison for child neglect. She also testified that she lived with her daughter at 23 Reba Christian Road in Natchez, Mississippi, in a trailer with three bedrooms and two bathrooms. Kelly stated her cousin owned the trailer and that it was fully furnished with adequate room for both her daughters. However, she provided no pictures of the home. Kelly also testified she slept at friends' houses if she was out visiting. As for work, Kelly testified that she worked as a receptionist for a doctor in Natchez, Mississippi.

2

She testified that she worked forty hours a week, Monday to Friday, and made $10 an hour. Prior to that, Kelly stated that she worked for her cousin as a child-care provider and made $200 a week. When asked about her alleged relationship with a man named Fred Mayberry, Kelly denied that the relationship was romantic. She further testified that she would sometimes go out with Mayberry while she was still married but maintained that they were just friends. Kelly denied that there was a picture on Facebook of her and Mayberry kissing. When Ken's attorney introduced the picture into evidence for impeachment, Kelly denied she was the woman in the picture.

¶6. Kelly testified that she drove a Nissan Altima with no tag. However, the vehicle she drove to court that day had a Claiborne County tag. A picture of her license plate was introduced as an exhibit at trial. When the court asked Kelly why she lied about the vehicle's tag, she said she did not know. Ken's attorney then introduced an exhibit into evidence showing a vehicle that looked identical to Kelly's vehicle at Mayberry's trailer. Kelly denied that was her vehicle and stated she could not remember anything about that specific event. When asked how many times she had been to Mayberry's trailer, she responded with, "I don't know." Kelly admitted that there was video footage of her and K.J. leaving Mayberry's trailer at 5:15 a.m. one morning. When asked why they were there so early, Kelly claimed she and K.J. "were feeding the horses or letting them out."

¶7. Kelly also denied ever going out of Mississippi with Mayberry. Ken's attorney introduced a photo from Kelly's Facebook account showing her and Mayberry in New Orleans, Louisiana, but Kelly denied she posted that picture. In addition, she admitted to

attending a rodeo with Mayberry but denied that it was out of state.

¶8. Kelly claimed that Ken once tried to run her off the road with his car, shot at her another time, and choked her in 2017. However, Kelly did not provide any corroborating evidence for any of those accounts. Additionally, Kelly admitted that she withheld K.J. from Ken for thirty-eight days after the separation and that she never called Ken to let him know K.J. was safe. Kelly denied ever calling Ken a derogatory name in front of K.J. At that point, Ken's attorney introduced a video where K.J. exited Kelly's vehicle, walked over to Ken, and called him a "punk ass." K.J. then added that her mother calls him a "punk ass." In the video, Ken responded, "Your mother is a joke." Kelly also testified that she got into a fist fight with Ken in 2016 at his father's repast[3] and that K.J. witnessed the fight.

¶9. Ken testified that he worked at Dickerson and Bowen, a paving contracting company, as a welder and made $16.50 an hour and worked forty hours a week. He also testified that he still lived in the marital home, which had three bedrooms and two bathrooms and was fully furnished. Ken stated that K.J. had her own room, clothes, and toys there. He testified that his cousin owned the home but that he had a written agreement allowing him to occupy the home as long as he paid the taxes and insurance for the property.

¶10. Ken testified that he and K.J. had a great relationship, and he provided details about what K.J. liked to do for fun. For example, he testified that she liked to feed horses, be around other children, and play outside. He stated that they also practiced the alphabet and used flash cards to practice colors and shapes. Ken testified that he and K.J. spent time with

---

[3] A repast is a meal gathering after a funeral.

extended family when they were able.

¶11.    Ken testified that he worked in Odessa, Texas, as a welder during K.J.'s first year of life.  He explained that Kelly did not want to go back to work that first year, so he needed a job that paid well to provide for Kelly, K.J., and his stepdaughter.  Ken stated that he left work in Odessa when K.J. was four months old to be closer to Kelly and the children.  Ken testified that there were at least ten times during his marriage when he would be outside doing chores and Kelly would leave without warning.  When that happened, Ken would go inside to be with the girls or bring them outside with him.

¶12.    Ken denied ever trying to run over Kelly with his vehicle, shoot Kelly, or choke Kelly.  He admitted, however, that he got angry and hit the back of Kelly's vehicle window when she withheld K.J. from him for thirty-eight days.  Ken stated that since the separation, Kelly had not kept him informed about K.J.'s whereabouts or how she was doing when she was in Kelly's care.

¶13.    Ken testified that saw Kelly's vehicle parked outside of Mayberry's trailer on more than one occasion.  One time, he saw Kelly and K.J. leave Mayberry's trailer around 5:15 a.m.  Ken recorded the incident, and that video was introduced at trial during Kelly's testimony.  Another time, he drove by Mayberry's trailer at night and saw Kelly's vehicle parked outside.  He testified that when he returned later that morning, he saw Kelly walk outside and get in the vehicle.  In regard to Kelly's alleged home at 23 Reba Christian Road, Ken claimed that when he drove by there on three or four occasions the home was not occupied.

¶14. Other witnesses, including Kelly's cousin, Ken's aunts, and Ken's mother, testified at trial. To the extent these witnesses' testimony was relevant to the chancellor's decision, that portion of their testimony will be discussed below in the analysis.

¶15. On November 1, 2018, the chancellor entered a judgment of divorce on the ground of irreconcilable differences. Regarding custody, the chancellor thoroughly discussed the *Albright* factors to determine the best interest of the child. The chancellor found the factor of the age, sex, and health of the child slightly favored Kelly. The chancellor found the following factors favored Ken: moral fitness of the parents; the home, school, and community record of the child; and stability of the home environment and employment of each parent. The chancellor found that the remaining applicable factors were neutral. Ultimately, the chancellor found that awarding Ken physical and legal custody was in K.J.'s best interest. The court awarded Kelly visitation rights and ordered her to pay $243 a month in child support.

¶16. On November 12, 2018, Kelly filed a motion for reconsideration, arguing that the chancellor erred in his *Albright* analysis. The court denied Kelly's motion on January 24, 2019. Kelly appealed.

**STANDARD OF REVIEW**

¶17. The standard of review for a child-custody case is limited. We will not reverse unless the trial court made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard. *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would

6

provide support for the chancellor's decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004) (quoting *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000)). Finally, "our polestar consideration," like the chancellor's, "must be the best interest of the child." *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶8) (Miss. 2002)).

## ANALYSIS

¶18.    The *Albright* factors are as follows: (1) age, health, and sex of the child; (2) continuity of care prior to the separation; (3) parenting skills and the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. *Albright*, 437 So. 2d at 1005.

¶19.    An *Albright* analysis is not a "mathematical formula." *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001). Further, the factors are not meant to be weighed equally in every case. *Divers v. Divers*, 856 So. 2d 370, 376 (¶27) (Miss. Ct. App. 2003). Our supreme court has held that "[a]ll the [*Albright*] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). "The chancellor, by his presence in the courtroom, is best

7

equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (Miss. 2001)). "In order to determine whether or not the chancellor was manifestly wrong [or] clearly erroneous[,] or abused his discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial . . . to ensure his ruling was supported by the record." *Hollon v. Hollon*, 784 So. 2d 943, 947 (¶13) (Miss. 2001).

### a.      Age, Health, and Sex of the Child

¶20.    The chancellor found this factor favored Kelly slightly but acknowledged that Ken proved he was well-equipped to care for K.J. At the time of trial, K.J. was three-and-a-half years old. The chancellor noted that K.J. was in good health and was well-behaved. In addition, the chancellor found that the tender years doctrine did not apply because K.J. could be "equally cared for by persons other than the mother." *See Woodham v. Woodham,* 17 So. 3d 153, 157 (¶19) (Miss. Ct. App. 2009) (rejecting the tender years doctrine where a four-year-old girl was equally cared for by both parents). This Court finds no clear error or abuse of discretion in the chancellor's finding.

### b.      Continuity of Care Prior to Separation

¶21.    The chancellor found this factor to be neutral. He based his decision on the fact that Kelly stayed at home alone with K.J. from two days after she was born until she was almost four months old while Ken worked in Texas. Ken testified that after four months of working in Texas, he returned home to be with his family and worked to provide for Kelly and K.J.

8

Ken also testified that on numerous occasions he would come home from work and participate in the caretaking role. For example, there were times when Kelly would leave, and he would take care of K.J. and his stepdaughter. Testimony also revealed that there was a period of time when Kelly left K.J. with Ken's mother. The court noted that although Kelly was the primary caregiver for K.J., Ken should not be punished for being the "primary breadwinner" of the family. The court further noted that since the separation, both parents were employed and willing to provide the primary care for K.J. This Court finds no clear error or abuse of discretion in the chancellor's finding this factor to be neutral.

### c. Parenting Skills

¶22. The chancellor also found this factor to be neutral. He based his finding on the fact that Ken and Kelly were both willing to provide child care for K.J. Ken testified that he bathed K.J. on occasion, and he could braid K.J.'s hair and paint her nails. He also testified that he cooked and cleaned and would get K.J. ready for bed. Ken's mother corroborated Ken's account of his parenting skills and testified that Kelly exhibited some parenting behavior that was concerning to her. For example, Ken's mother testified that Kelly would hit the children for very little reason and would curse in front of them. This account was corroborated through a video played for the court, where K.J. was heard cursing, and telling Ken, "My mama said you're a punk ass." Kelly admitted she did not correct K.J. Ken testified that Kelly would leave the children in the house alone, without informing him of where or why she was leaving. Ken would be in the yard working, and he would stop what he was doing to go inside with the children.

¶23. Both Ken and Kelly testified that they were in relatively good health and had no mental-capacity issues or mental illnesses. Both parties had witnesses testify to their "great" parenting. Ken even admitted that Kelly was a good mother and that K.J. loved her mom. Kelly would not admit the same about Ken's parenting skills but did testify that K.J. loved her father.

¶24. Further, the chancellor stated, "Kelly was caught on multiple occasions, where she lied, even about things that would not ordinarily affect the outcome of this case. Truthfulness is an important parenting skill in rearing a child, and Kelly has proven herself not to be truthful." It is well-settled that the chancellor "has sole authority to determine the credibility of the witnesses." *Joel v. Joel*, 43 So. 3d 424, 433 (¶28) (Miss. 2010). Thus, the chancellor was within his discretion to find Kelly's testimony lacked credibility. This Court finds no clear error or abuse of discretion in the chancellor's finding on this factor.

### d. Employment Responsibilities

¶25. The chancellor found this factor favored neither party. At the time of trial, Ken had worked for Dickerson and Bowen for two years. He worked forty hours a week, Monday through Friday from 7 a.m. to 5 p.m. He testified he may have to work on some weekends, but that was rare. Ken also testified that his job was flexible. In regard to Kelly, she had multiple different employers over the years and had failed to keep steady employment throughout K.J.'s life. At one point, her cousin employed Kelly as a sitter. At the time of trial, she worked as a receptionist for a doctor in Natchez on Monday through Friday from 8:30 a.m. to 5 p.m. Kelly testified that her cousin took care of K.J. when she was at work.

This Court finds no clear error or abuse of discretion in the chancellor's application of this factor.

### e.    Physical and Mental Health and Age of the Parents

¶26.    The chancellor found this factor to be neutral.  At the time of trial, Kelly was thirty years old and had no mental or physical health issues.  Ken was thirty-one years old and likewise had no mental or physical health issues, other than his medication-controlled high blood pressure.  Ken testified that his blood pressure issue did not affect his ability to provide child care.  This Court finds no clear error or abuse of discretion in the chancellor's finding that this factor was neutral.

### f.    Emotional Ties of Parent and Child

¶27.    The chancellor found this factor to be neutral because K.J. was emotionally tied to each parent equally.  Kelly testified that K.J. loved her father, and Ken testified that K.J. loved her mother.  Additionally, multiple witnesses testified that Ken and K.J. had a great father/daughter relationship and that Kelly and K.J. had a great mother/daughter relationship. This Court finds no clear error or abuse of discretion in the chancellor's finding on this factor.

### g.    Moral Fitness of the Parents

¶28.    The chancellor found this factor favored Ken.  The chancellor based his decision in part on that fact that "Kelly had multiple inconsistencies in her testimony which [led] this Court to conclude that she was not a truthful person, and that this is a character flaw."  For example, "Kelly denied having an extramarital relationship with []Mayberry, while other

11

witnesses provided testimony that would lead a reasonable person to another conclusion." When presented with a picture of her and Mayberry kissing, Kelly denied it was her in the picture. The chancellor stated that it was his opinion that Kelly was the woman in the picture. The chancellor also stated that "Kelly was evasive as to how many times she was at Mayberry's home, and would not even admit to a car, described exactly as her car, being parked in [] Mayberry's yard." Further, "Kelly was untruthful about having a Claiborne County tag on her vehicle, at her deposition and again in open Court, perhaps to cover up the fact that it was her vehicle at []Mayberry's home overnight."

¶29. Kelly testified that she lived at 23 Reba Christian Road, Natchez, Mississippi. However, multiple witnesses testified that the property appeared to be abandoned. One witness testified that the electricity meter had barely moved when he visited the property on multiple occasions. He also testified that he found Kelly's car at Mayberry's home on multiple occasions, where she appeared to stay overnight.

¶30. In a video played at trial, K.J. called Ken a "punk ass" and said, "My mama said you was a punk ass." Kelly denied cursing in front of her child, but the court did not believe her. Kelly admitted that she got into a fist fight in front of K.J. at Ken's father's repast after his funeral. She also admitted that she did not tell K.J. after the fact that violence was not an appropriate way to resolve conflict.

¶31. Ken admitted that he lost his temper at one point and hit the back glass of Kelly's car. Ken was also seen on video telling K.J., "Your mother is a joke." The chancellor gave no credibility to the allegations that Ken shot at Kelly, that Ken choked Kelly, or that he

attempted to run Kelly off the road. As previously stated, the chancellor was well within his discretion to find Kelly's testimony was not credible, and there was substantial evidence to support his weighing of this factor. Thus, this Court finds no clear error or abuse of discretion in the chancellor's finding on this factor.

### h. Home, School, and Community Record of the Child

¶32. The chancellor found this factor favored Ken. At the time of trial, K.J. was three-and-a-half years old and had no prior school record. Ken took K.J. to church with him on his weekend visitation periods, where multiple family members testified they attended. Ken testified that he had multiple family members near him willing to assist him if necessary. Multiple family members corroborated his testimony. Ken and multiple family members testified that they were a close family and that K.J. was involved in various family functions. Kelly testified that she rarely went to church. Further, she failed to produce testimony of any relatives with close ties living in close proximity to her, besides a cousin whom she paid to watch K.J. For these reasons, this Court finds no clear error or abuse of discretion in the chancellor's finding on this factor.

### i. Stability of Home and Employment of Each Parent

¶33. The chancellor found this factor favored Ken. The chancellor based his decision in part on Kelly's untruthfulness about where she lived. Although she claimed to live at 23 Reba Christian Road, multiple witnesses testified that the home at 23 Reba Christian Road was abandoned. No pictures were offered of the property at 23 Reba Christian Road, and only Kelly's cousin offered any credible evidence that she allowed Kelly to use the home.

13

¶34. At the time of trial, Ken still resided in the marital home, which his cousin owned. Ken's home was a three bedroom, two bathroom home, and K.J. had her own room. As previously stated, Kelly and Ken were both employed at the time of trial. After review, we find no clear error or abuse of discretion in the chancellor's finding on this factor.

### j. Other Relevant Factors

¶35. Finally, the chancellor considered K.J.'s relationship with her half-sister, Kelly's other daughter who lived with them. The chancellor explained that although the court was "hesitant" to split up siblings, the facts warranted a split in this case. The record shows that K.J. had a close bond with her half-sister, and Ken testified that he would foster that relationship. This Court finds no clear error or abuse of discretion in the chancellor's conclusion.

## CONCLUSION

¶36. In summary, the chancellor's *Albright* analysis and his determination of K.J.'s best interest were neither clearly erroneous nor an abuse of discretion and were supported by substantial evidence produced at trial. Therefore, we affirm the chancery court's judgment.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., NOT PARTICIPATING.**

14